NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

10K, L.L.C., *Plaintiff/Appellee/Cross-Appellant*,

*v.*

W.V.S.V. HOLDINGS, L.L.C., et al., *Defendants/Appellants/Cross-Appellees*.

No. 1 CA-CV 17-0155
FILED 11-8-2018

Appeal from the Superior Court in Maricopa County
No. CV2003-008362
The Honorable Arthur T. Anderson, Judge

**AFFIRMED**

COUNSEL

Cohen Dowd Quigley P.C., Phoenix
By Daniel G. Dowd, Daniel E. Durchslag, Rebecca van Doren
*Co-Counsel for Plaintiff/Appellee/Cross-Appellant*

Stinson Leonard Street, LLP, Phoenix
By Michael C. Manning, Jeffrey J. Goulder, Stefan Palys
*Co-Counsel for Plaintiff/Appellee/Cross-Appellant*

Cooley LLP, Palo Alto, California
By Stephen C. Neal, Christopher B. Durbin, Jeffrey S. Karr, *All Appearing Pro Hac Vice*
*Co-Counsel for Defendants/Appellants/Cross-Appellees*

Quarles & Brady, LLP, Phoenix
By Lauren Elliott Stine, Rodney W. Ott
*Co-Counsel for Defendants/Appellants/Cross-Appellees*

---

**MEMORANDUM DECISION**

Presiding Judge Maria Elena Cruz delivered the decision of the Court, in which Judge Jennifer B. Campbell and Judge James P. Beene joined.

---

**C R U Z**, Judge:

**¶1**         W.V.S.V. Holdings, L.L.C., ("WVSV") and Conley Wolfswinkel appeal the superior court's orders denying their motion for judgment as a matter of law ("JMOL") and granting judgment in favor of 10K, L.L.C. ("10K") on its aiding and abetting a breach of fiduciary duties claim.  10K cross-appeals the court's denial of their claim for declaratory judgment and the aiding-and-abetting claim's damages calculation.  For the following reasons, we affirm the court's orders.

**FACTUAL AND PROCEDURAL HISTORY**[1]

**¶2**         The underlying facts we have recounted in detail in *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 381-92, ¶¶ 2-48 (App. 2012), but we provide the pertinent facts as follows.  Between 1995 and 2002, several real estate transactions were completed, involving: 10K, an entity composed of a pool of investors; Phoenix Holdings II, L.L.C. ("PHII"), 10K's management entity consisting of Robert Burns and Brent Hickey; Breycliffe, L.L.C.[2] ("Breycliffe"), the buyer of 10K's property (real property consisting

---

[1]      We review the evidence in the light most favorable to upholding the superior court's decision. *Baker v. Meyer*, 237 Ariz. 112, 113, ¶ 2 (App. 2015).

[2]      Breycliffe, L.L.C., is a Nevada limited liability company serving as the equity interest holder for its European entity, Breycliffe, Inc.  Breycliffe, Inc.'s equity was provided by Patrick O'Connor in the form of a

of land held by 10K and Spurlock Land, L.L.C. ("Spurlock") to be marketed and jointly sold to Breycliffe); and WVSV, the buyer of Breycliffe's interest under the contract and a company formed by Conley Wolfswinkel.

¶3            Between 1998 and 2002, 10K and Spurlock entered into a contract for 10K to purchase land from Spurlock to be jointly marketed and sold to a third-party buyer.  PHII, as 10K's manager, located a buyer, Breycliffe, to purchase the combined land simultaneously with Spurlock's sale to 10K.  These two transactions form the basis of the 1998 agreement ("Agreement"), and later the 2002 Breycliffe Agreement ("2002 Agreement"), which were incorporated into Judge J. Kenneth Mangum's June 4, 2002 order.  Under the Agreement, 10K was set to receive substantial sums for its land, as well as 20% of total profits upon the sale of the real property by Breycliffe.  Under the Agreement, Breycliffe had the right to assign its interest in whole or in part, "without the consent of 10K."

¶4            In late 2001, Breycliffe sought to assign its interest due to concerns that it would be unable to fulfill its contractual obligations.[3]  PHII, acting on behalf of Breycliffe, secretly maneuvered to effectuate Breycliffe's assignment.   PHII sought substantial profit participation in any such agreement.  When 10K discovered this activity, they instructed PHII to cease its actions.[4]   10K discovered that PHII had met with Conley Wolfswinkel and had either offered him Breycliffe's interest or were soon going to do so.  10K instructed PHII to instead sell Breycliffe's interest to

---

Liechtenstein trust, whose trustee was Corps. Trust (later Caversham), and whose protectors were O'Connor and John Meachem (later Peter Bennett).  Some combination of Meachem and Robert Burns approached O'Connor with the land deal, and set about creating Breycliffe, Inc., and Breycliffe, L.L.C.  Burns and Hickey, as PHII, served as Breycliffe's project manager in Arizona.

[3]      Breycliffe was set to put $30,000,000 into the project to start developing the land.  While 10K claims this was an obligation, it concedes it was an oral representation and was not contained within the Agreement.

[4]      PHII, as managers of 10K, was set to receive profit participation of 50%.  Gilbert, an investor in 10K, testified this provision acted as a safeguard, ensuring PHII would benefit by the optimal sale of 10K's land, and that further profit participation obtained by PHII could seriously hinder their motivation to fulfill their fiduciary duties to 10K.

10K, and 10K's investors advised PHII that they were ready and willing to meet the financial obligations in order to do so.

¶5 Burns, on behalf of PHII, met with 10K investors to discuss their concerns, however, Hickey simultaneously met with Wolfswinkel and they completed the assignment transaction (the "Assignment"). WVSV purchased Breycliffe's interest for $7,850,000 and obtained 60% of Breycliffe's original 80% interest; the remaining 40% going to PHII. Breycliffe retained a 25% interest in WVSV. *See Cal X-Tra*, 229 Ariz. at 383 n.6.

¶6 In 2003, 10K filed suit against PHII, Breycliffe, and WVSV, alleging: (1) breach of fiduciary duty; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) conversion; (5) fraud; (6) constructive fraud; (7) unlawful acts; and (8) declaratory judgment. The court dismissed 10K's eighth claim for relief, the declaratory judgment claim. 10K thereafter amended its complaint to include a claim against WVSV for aiding and abetting a breach of fiduciary duty.[5]

¶7 In April 2012, based on the existence of extrinsic evidence of fraud, this Court held the superior court did not abuse its discretion when it vacated its prior judgment in favor of WVSV. *Cal X-Tra*, 229 Ariz. at 395-96, ¶¶ 60-62. The effect was to reinstate 10K's original eighth claim for relief: declaratory judgment invalidating the 2002 Agreement and subsequent assignment to WVSV.[6] *Id.* at 402, ¶ 85.

¶8 In November 2013, 10K submitted its third amended complaint against WVSV and Wolfswinkel (collectively, the "Defendants"),

---

[5] 10K submitted a second amended complaint in April 2004, alleging: (1) breach of fiduciary duty; (2) breach of contract; (3) breach of covenant of good faith and fair dealing against PHII; (4) conversion against PHII defendants; (5) fraud against PHII defendants; (6) declaratory judgment against Breycliffe and WVSV; (7) aiding and abetting a breach of fiduciary duty against Breycliffe; and (8) aiding and abetting a breach of fiduciary duty against WVSV and Conley Wolfswinkel.

[6] 10K settled its claims against PHII, Burns, Hickey, and Breycliffe in July 2007. *See Cal X-Tra*, 229 Ariz. at 388, ¶ 30.

alleging (1) aiding and abetting a breach of fiduciary duties, and (2) seeking declaratory judgment relief based on the invalidity of the 2002 Agreement.

¶9　　　　In July 2014, 10K moved for partial summary judgment on its claims. In response, Defendants cross-moved for partial summary judgment on 10K's claims, as well as moved for partial summary judgment on the ground punitive damages could not be proven. The court granted 10K's motion for partial summary judgment for the declaratory relief claim, but only to the extent that previous litigation vacated the Mangum Judgment.[7] The court denied 10K's motion to invalidate the 2002 Agreement and denied all other motions for partial summary judgment.

¶10　　　　A bench trial began on January 13, 2015.[8] At the conclusion of trial, Defendants moved for JMOL, arguing the evidence did not support 10K's case. The court construed Defendants' motion as one for partial findings, pursuant to Ariz. R. Civ. P. ("Rule") 52(c) and denied it. In December 2015, the court found PHII breached its fiduciary duties to 10K by shopping Breycliffe's interest in the Agreement without informing 10K and ignoring 10K's direction to facilitate the purchase to itself instead of to Defendants. The court found the Defendants knew of 10K's objections and PHII's conflicting role, yet furthered its own deal, thereby substantially assisting PHII in violating its duties to 10K. The court found 10K suffered damages due to the lost opportunity to purchase Breycliffe's interest and to realize profits, and that Defendants were 30% liable for aiding and abetting PHII's breach of fiduciary duties, for an award of $86,400,000. The court concluded by denying 10K's declaratory relief claim based on the doctrine of election of remedies, denying 10K's request for a constructive trust, and denying 10K's request for punitive damages.

¶11　　　　Defendants moved again for JMOL, for amended findings of fact, and for a new trial. 10K filed motions to amend the ruling, and the court then supplemented its findings of fact. The court denied WVSV's post-trial motions but reduced its damage award to $66,871,062 based on the argument that the damage calculation needed to reflect the breach found by the court.

¶12　　　　Defendants moved for reconsideration. The court denied their request but granted a motion for reconsideration by 10K to adjust the

---

[7]　　　Defendants moved for reconsideration, which the court denied.

[8]　　　Trial was initially set to be tried to a jury but was changed to a bench trial on the second day.

damage award to account for factual inaccuracies in the court's previous ruling. Based on an additional disclosure by 10K's damages expert, the court found the amount of damages to be $67,509,364.

**¶13** Defendants again moved for a new trial, for amended findings, and to amend the judgment. The court denied Defendants' motions, and Defendants timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 12-2101(A)(1) and (5)(a).

## DISCUSSION

I.      Defendants' Appeal from Aiding and Abetting a Breach of Fiduciary Duties

**¶14** 10K presented two claims for trial: (1) declaratory judgment that the 2002 Agreement was invalid, void, voidable, unenforceable, or subject to rescission; and (2) damages resulting from Defendants' aiding and abetting a breach of PHII's fiduciary duties. 10K premised its damages claim on a theory of a breach of fiduciary duties perpetrated by PHII, of which Defendants aided and abetted. 10K's declaratory judgment claim was premised on its claim that the 2002 Agreement was invalid because 10K never consented to the sale, and that the contract was unenforceable due to PHII's self-dealing. At the conclusion of trial, the court found 10K sufficiently proved damages suffered as a result of Defendants' aiding and abetting PHII's breaches of fiduciary duties.

**¶15** Defendants challenge the court's factual findings and argue: (1) 10K never presented a theory of damages predicated on the breach found by the court; (2) 10K failed to present evidence that the breach of fiduciary duty found by the court caused any damage; and (3) the court erred in relying on 10K's "late disclosure" to repair 10K's failure to prove damages.[9]

---

[9]     Defendants argue on appeal that the court erred in denying its motion for JMOL based on 10K's failure to prove damages. We treat the denial of Defendants' motion for JMOL on appeal as the same as its claim that 10K failed to prove damages, just as the court did when it originally denied Defendants' JMOL. While Defendants argue a *de novo* standard of review applies based on Arizona Rule of Civil Procedure 50, we note this case was not tried to a jury, but to the judge as a bench trial. As such, Rule 50 does not apply, and we instead apply Rule 52 and review the court's

¶16 Following a bench trial, we review the superior court's factual findings for clear error but review its legal conclusions *de novo*. *Tobias v. Dailey*, 196 Ariz. 418, 420, ¶ 7 (App. 2000). We will affirm the court's factual findings if they are supported by substantial evidence. *In re U.S. Currency*, 199 Ariz. at 295, ¶ 9. If a party requests specific findings, we will affirm the court's findings so long as the court clearly stated how it arrived at its conclusions. Ariz. R. Civ. P. 52(a); *Kelsey v. Kelsey*, 186 Ariz. 49, 51 (App. 1996). We "may infer from any judgment the findings necessary to sustain it if such . . . findings do not conflict with express findings and are reasonably supported by the evidence." *Thomas v. Thomas*, 142 Ariz. 386, 390 (App. 1984) (citation omitted*)*. We will not reverse the court's findings simply based on the existence of conflicting evidence. *In re U.S. Currency*, 199 Ariz. at 295, ¶ 9.

¶17 "Arizona recognizes aiding and abetting as embodied in Restatement § 876(b), that a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person." *Wells Fargo v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 485, ¶ 31 (2002) (citation omitted). Aiding and abetting requires proof of a primary tort, and a causal connection between the defendant's conduct and the primary tortfeasor's commission of the tort. *Security Title Agency, Inc. v. Pope*, 219 Ariz. 480, 491, ¶ 44 (App. 2008). It further requires proof that the defendant's conduct in aiding and abetting was the cause of harm suffered by the plaintiff. *Id.* at 492, ¶ 49. Because aiding and abetting is a theory of secondary liability, the defendant charged with aiding and abetting must have knowledge of the primary tort, but such knowledge may be inferred from the circumstances. *In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1436 (D. Ariz. 1992).

A.    Theory of Damages

¶18 Defendants argue the court erred by awarding 10K damages because the court's award was based on a theory of damages 10K did not argue at trial, and of which 10K failed to prove. Defendants claim that 10K neither sought, nor proved, any damages resulting from the breach related to PHII's conduct regarding the Assignment. Defendants base their argument on their claim that 10K only ever presented a theory of damages based on the invalidity of the Agreement, and that 10K never presented a damages theory on any secondary breaches.

---

factual findings for clear error. *See In re U.S. Currency in the Amount of $26,980.00*, 199 Ariz. 291, 295, ¶ 9 (App. 2000).

¶19            It is the "general law in Arizona that a party must timely present his legal theories to the trial court so as to give the trial court an opportunity to rule properly." *Payne v. Payne*, 12 Ariz. App. 434, 435 (1970); Ariz. R. Civ. P. 26.1(a).   A party may state as many separate claims, regardless of consistency, but must state its demand for relief sought, which may include relief in the alternative.  Ariz. R. Civ. P. 8(a)(3), (d)(2)-(3); *see also Davis v. Cessna Aircraft Corp.*, 168 Ariz. 301, 304 (App. 1991) (stating "[a] party has multiple claims if the factual basis for recovery states different claims that [can] be separately enforced").   It is incumbent on the party seeking damages to specify the legal theory, or theories, on which they intend to rely.  *Hunter Contracting Co. v. Sanner Contracting Co.*, 16 Ariz. App. 239, 245 (1972).

¶20            A review of the record reveals 10K pursued two claims against Defendants: (1) declaratory judgment to invalidate the 2002 Agreement based on (a) lack of consent, and (b) PHII's material concealments; and (2) damages resulting from Defendants' aiding and abetting a breach of PHII's fiduciary duties.  10K put forth multiple legal theories supporting relief and argued PHII's conduct constituted a continuous breach of its fiduciary duties.  *See Cal-Xtra*, 229 Ariz. at 406-08, ¶¶ 96-103.  10K's third amended complaint, the cause of the present action, alleged PHII breached duties of loyalty, fairness, integrity, honesty, full disclosure, and utmost good faith, by, including but not limited to: entering the 2002 Agreement without 10K's consent; teaming with Breycliffe to make false representations to 10K; subjugating the best interests of 10K by secretly attempting to secure "side deals" and profit participation, and failing to enforce 10K's rights against Breycliffe; ignoring the 10K's members' request that PHII work on 10K's behalf to facilitate 10K's purchase of Breycliffe's interest; ignoring 10K's directive to not facilitate the sale of Breycliffe's interest to Wolfswinkel (or any entity controlled by him); seeking profit participation for itself and subjugating the best interests of 10K to third parties; and working covertly to close on the 2002 Agreement and divest 10K of its property interests.

¶21            The court could properly consider whether PHII's breaches of its duties associated with the Assignment caused 10K damage.  In this regard, 10K claims the economic theory and methodology underlying the damages awarded by the court were the same presented to the court during trial, discussed *infra*.  We agree.

8

B.     Causation

¶22     Defendants argue 10K failed to prove causation as to the underlying breach; that PHII's breach caused 10K to lose the opportunity to buy Breycliffe's interest.[10]

¶23     Causation is generally a question of fact, and thus we review the court's factual finding for clear error and will affirm if the court's finding is supported by substantial evidence. *Salica v. Tucson Heart Hosp.-Carondelet L.L.C.*, 224 Ariz. 414, 419, ¶ 16 (App. 2010); *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51-52, ¶ 11 (2009).

¶24     A "but for" cause is one without which the injury would not have occurred. *Salica*, 224 Ariz. at 418, ¶ 13. 10K pursued damages in its aiding and abetting claim in the form of lost profits (lost opportunity). To prevail, 10K must have proven that it would have realized profits but for PHII's conduct. *See* Robert L. Dunn, 2 *Recover of Damages for Lost Profits* § 7.22 at 648 (6th ed. 2005). "Damages that are speculative, remote or uncertain may not form the basis of a judgment." *Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 521 (1968). While speculation is insufficient, the plaintiff is not required to prove causation beyond a reasonable doubt; he need only introduce evidence which affords a reasonable basis for the relation of cause and effect. *Purcell v. Zimbelman*, 18 Ariz. App. 75, 82 (1972) (citing Prosser, *Law of Torts* § 41, at 242 (4th ed. 1971)).

¶25     In its December 2015 findings and conclusions of law, the superior court concluded PHII owed 10K fiduciary duties and that:

> PHII breached its fiduciary duties to 10K by shopping Breycliffe's interest in the 2002 Breycliffe Agreement without informing 10K that its business partner (Breycliffe) was seeking a buyer. PHII further breached its fiduciary duties by ignoring 10K's direction to disregard Wolfswinkel and facilitate the purchase of Breycliffe's interest by 10K.
>
> PHII purposely ignored 10K because PHII knew it would never get additional profit participation from 10K. . . .

---

[10]     Defendants do not challenge, and so we do not consider, the superior court's findings on a basis that 10K failed to prove "a causal connection between [Defendants']" conduct and "[PHII's] commission of the tort," or that Defendants' conduct in "aiding and abetting was the cause of harm to [10K]." *See Pope*, 219 Ariz. at 491-92, ¶¶ 47-48.

When Wolfswinkel demonstrated his ability to move quickly and willingness to consider additional profit participation for PHII, PHII focused on closing the deal, contrary to 10K's instruction and in further violation of its fiduciary duties. . . .

10K was damaged by the lost opportunity to purchase Breycliffe's interest and to realize profits from total ownership.

¶26        The court based its conclusions on its factual findings drawn from 10K's operating agreement, management agreement with PHII, the Spurlock and 10K joint-marketing agreement, the 2002 Agreement, and PHII's and Defendants' conduct in bringing about the Assignment.

¶27        In response to Defendants' post-trial motions, the court supplemented its findings, adding:

> 60. Following the September 11, 2001 attack, the financiers of Breycliffe sustained significant losses that made it unlikely for them to comply with the 1998 Breycliffe Agreement.
>
>     . . .
>
> 63. In April, 2002, PHII identified Garth Weiger as a potential buyer of Breycliffe's interest. Eventually, Weiger structured a deal with Breycliffe that was scheduled to close on a [sic] June 4, 2002. When Weiger cancelled escrow, Breycliff[e] was left without a viable buyer.
>
>     . . .
>
> 65. When 10K learned of the availability of Breycliffe's interest, it directed PHII to facilitate 10K's acquisition of the Weiger deal and to exclude Wolfswinkel.
>
>     . . .
>
> 67. Motivated by the prospect of an additional profit share from Wolfswinkel, PHII pushed the Wolfswinkel deal and facilitated the out-of-hand dismissal of the 10K proposal.
>
> 68. During this search process, PHII placed its own financial interest above its duties as 10K's Manager. . . .

10

69. The Management Agreement gave PHII exclusive authority to make all decisions required to accomplish the business and objectives of the company. The objectives were to "acquire certain real estate property for planning, zoning and resale. . . ." Management Agreement, Recitals, ¶ A. PHI[I] was also directed to "Do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business." Operating Agreement ¶ 2.2(l). PHII was to be [sic] carry out its responsibilities "diligently, in a timely fashion and in a good businesslike manner and [with the use of] its reasonable best efforts to perform its duties hereunder." Operating Agreement ¶ 2.3.

70. PHII acted contrary to [the] Management Agreement by jettisoning its duties and compromising the Company's objectives in order to self-deal for greater profit participation. Notably, self-dealing and disloyalty are inconsistent with the Management Agreement's duty to perform acts as may be necessary or appropriate to the conduct of the Company's business and the duty to act in a "good businesslike manner."

71. Furthermore, these actions defy the fundamental common law duty of loyalty and prohibition against self-dealing. PHII also ignored the implied duty of good faith it owed to its contractual partner—10K.

72. These breaches caused Breycliffe to enter the June 28, 2002 contract with Wolfswinkel. These breaches caused 10K to lose the opportunity to acquire Breycliffe's interest.

73. Without Wolfswinkel, Breycliff[e] . . . needed a dance partner. The 10K proposal contained terms already accepted by Breycliffe (Weiger terms)[.]

74. Breycliff[e] would have accepted the 10K deal . . . but for PHII's breaches.

¶28 While 10K had no contractual right or other entitlement to Breycliffe's position, the evidence supports the court's findings that, but for PHII's and Defendants' actions, Breycliffe would have sold its position to 10K.

¶29        10K members testified they instructed PHII that they wanted to purchase the Assignment.  Evidence demonstrated that O'Connor, Breycliffe's equity provider, was experiencing cash flow problems, and began looking to sell his interest in late 2001.  Breycliffe's financial constraints precluded it from making the necessary investments for it to close as of the March 2002 closing date.  After the Weiger deal fell through, the evidence demonstrates that Breycliffe was anxious to get a replacement purchaser.  While O'Connor put up $205,000 on June 4, 2002, as a required debt service payment to enable the 18-month closing date extension, Breyclifffe did not have the capital to pay its further obligations, and thus was anxious to sell quickly.  Besides PHII's profit participation, the terms of the Weiger offer and Wolfswinkel's were comparable, and the court could reasonably find that a similar offer by 10K would have been accepted by Breycliffe.[11]

¶30        Breycliffe's local signatory and manager, Sharyl Poulson-Speaker, stated that she believed 10K was offered Breycliffe's position after the Weiger deal collapsed, but that 10K rejected the offer.  Poulson-Speaker stated it was only after she believed 10K declined Breycliffe's interest that Breycliffe proceeded to offer the position to Wolfswinkel.  10K members testified that PHII never offered 10K the opportunity, and only discovered the potential sale after being informed of it by an independent party.  Hickey testified that he and Burns formed SV Investments to manage the property on behalf of the purchaser of Breycliffe's interest, negotiated the terms of the sale with Wolfswinkel, but did not disclose any of their dealings to 10K and instead attempted to cancel 10K meetings, all while PHII continued to serve as 10K's manager.

¶31        While the relationship between 10K and Breycliffe was "not exactly smooth," and Breycliffe was warned of future dealings with 10K, 10K was willing to put up the cash to purchase Breycliffe's position and wanted to perform quickly; an important consideration of Breycliffe's.  Further, Bennett, *see footnote 2,* stated profit participation for PHII was not an important consideration in a potential assignment, nor did Breycliffe care if PHII retained its status as project manager.  Lastly, Bennett stated he was unaware of Wolfswinkel's past convictions at the time, and, if disclosed

---

[11]        The court incorrectly found Breycliffe was required to pay the Citibank Loan obligation instead of 10K, its Amended Finding No. 62., but that incorrect finding does not require that we find the court's other findings factually unsupported given the evidence presented.

by Brown & Bain, thought they could have caused concern in the assignment.

**¶32** Given PHII's failure to inform 10K of Breycliffe's desire to sell its interest, the failure to loyally represent 10K's interests in purchase and sale discussions with Breycliffe, and failure to follow its principal's directions, among others, the evidence supports the court's findings that but-for PHII's actions 10K would have bought Breycliffe's interest.

### 1. Amount of Damages

**¶33** "Once the Fact of damages has been established, the Amount of the damages may be established with proof of a lesser degree of certainty than is required to establish the fact of damage." *Earle M. Jorgensen Co. v. Tesmer Mfg. Co.*, 10 Ariz. App. 445, 450 (1969). Uncertainty as to amount does not preclude recovery, so long as plaintiff's evidence provides a basis for "an approximately accurate estimate." *Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, 162, ¶ 38 (App. 2007) (citation omitted). "Where there is sufficient evidence in the record to sustain the findings of the trial court on [the] issue of damages, the findings will not be disturbed on appeal." *Fousel v. Ted Walker Mobile Homes, Inc.*, 124 Ariz. 126, 130 (App. 1979).

**¶34** Defendants challenge the court's damage award on the legal basis that the court denied the factual predicate forming the basis of 10K's damage calculation. Defendants argue 10K's damage computation was modeled on the invalidity of the 2002 Agreement; however, that basis will not invalidate the court's damage award, so long as 10K provided sufficient evidence for the court to make an accurate estimate as to the amount of damages.

**¶35** 10K provided a damages model based on lost profits from the hypothetical sale of the Sun Valley Property in 2005. The computation model is applicable for both scenarios, whether 10K obtained the property due to the invalidity of the 2002 Agreement or obtained the property by purchasing the Assignment; while some predicate factors would be different, the theory is the same. *See SDR Assocs. v. ARG Enter., Inc.*, 170 Ariz. 1 (App. 1991) (discussing different methods for calculating damages, i.e., whether the court should have applied "diminution of market value" instead of "cost of repair"). Here, 10K's damages award reflects the amount of lost profits it would have realized from the sale of the property, minus the applicable contractual obligations, expenses, and costs. As the court stated:

Duncan's damage testimony modeled the income and expenses associated with the 2005 development of the Sun Valley Property. Duncan assumed that 10K reacquired the property to proceed with the project—an assumption challenged by [WVSV]. Duncan's analysis remains relevant to damages if 10K is found to have obtained Breycliffe's interest.

We agree.

¶36         10K's damage expert, Duncan, testified that he based his lost profits analysis on the difference between but-for profits had the alleged breach not occurred, and the actual profits given that the alleged actions did occur. The difference between the two constitutes the "harm" suffered.[12] Duncan conducted market research and spoke with industry participants in the Phoenix area. Based on his research, Duncan concluded 10K's real estate expectations in 2002 and 2003 were reasonable, that when Duncan spoke with 10K, they admitted their desire to sell the land in 2005, and appraisals indicated the market value of the land in 2005 was $231,555,000, or roughly $18,000 per acre. Duncan's research considered the reasonableness of 10K's belief that they could have sold the land in 2005, relied on an appraiser, and determined 10K's reasonable net proceeds from an actual sale if it had occurred in 2005. Duncan's model was based on the assumption that 10K would not have entered the 2002 Agreement and would have honored the Spurlock Agreement; however, he stated that apart from the 300 acres retained by Breycliffe in the Assignment, the only factor driving the quantification of damages between the but-for world and actual world—the Agreement's validity and sale of Breycliffe's position to WVSV—was the difference in proportional ownership amount of proceeds. Duncan believed the first two assumptions would have given 10K control of the Sun Valley Property and all associated cash flows, the contractual benefit WVSV obtained, and discussed, in Duncan's testimony regarding the "actual profits."

---

[12]     Duncan proposed five main categories of models: categories one through three concerned 10K's purchase of the land requiring major developmental work; category four concerned an outright sale of the property; category five mirrored the factual circumstances as actually occurred with the Assignment to WVSV. Duncan testified that while different assumptions, factual predicates, could be offered, the damage model was the same.

¶37 Even if the damages model contained incorrect factual predicates, it could be amended to reflect a change in percentage ownership by 10K; if 10K's percentage ownership differed, depending on whether it obtained control over the Sun Valley Property by entering the 2002 Agreement, or purchasing the Assignment, those percentage differences could be accounted for within the same damages model. Duncan's model accounted for payoff of the Citibank Loan, expenses related to performing on the Spurlock contract, and then-related project costs. Duncan concluded 10K's lost profits to be $288,000,000. The present-day value of which, as of the date of trial, was $312,400,000. As for its actual profits, reflective of the situation as it factually unfolded and was projected to factually unfold, Duncan projected 10K would make hundreds of millions in future profits, but that its current, present-day value (in 2015), was $24,000,000, compared to its but-for profits of roughly $312,000,000. The court concluded 10K's damages totaled $288,000,000 as of March 31, 2014, found Defendants were 30% at fault, and awarded 10K $86,400,000 in compensatory damages against Defendants.

¶38 We therefore hold that the court's damage award was supported by substantial evidence.

C. 10K's "Late Disclosure"

¶39 Defendants claim the court impermissibly allowed late disclosure to support its damage award.

¶40 After trial, Defendants moved for a new trial and amended findings of fact and conclusions of law; Defendants claimed that, given Duncan's model was based on the invalidity of the 2002 Agreement, 10K's damage award did not account for expenses related to the purchase of the Assignment, or for lesser profits because Breycliffe retained a 20% profit interest and 300 commercial acres of land, among other variables. 10K argued the court's damage award was premised on the entirety of PHII's misconduct and harm suffered by 10K.

¶41 On October 10, 2016, in response to Defendants' motions, the court amended its damage calculation to account for deductions associated with the purchase of the Assignment and subsequent development, and sale, of the Sun Valley Property. The court struck its December 21, 2015 compensatory damages award, decreased 10K's lost profits income to $222,903,543, and awarded 10K compensatory damages against Defendants in the amount of $66,871,062, based on the same 30% apportionment of fault.

**¶42**         Defendants and 10K both thereafter factually challenged the court's damage award and moved again for reconsideration.[13]  In support of its motion for reconsideration, 10K attached a declaration by Duncan modifying his calculation to account for factual predicates associated with the breach found by the court.  Defendants moved to strike Duncan's declaration as a new expert opinion pursuant to Rules 59(b), 26.1, and 37(c).  The court admitted Duncan's declaration, and denied WVSV's motion to strike.  Based on the updated calculations, the court concluded 10K's lost profits amounted to $225,031,215, and awarded 10K compensatory damages in the amount of $67,509,364 against Defendants.

**¶43**         Defendants argue 10K's additional damages evidence— Duncan's declaration—constitutes late disclosure and should have been excluded pursuant to Rules 26.1 and 37(c).

**¶44**         Rule 26.1 requires parties to timely disclose "the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, [and] a summary of the grounds for each opinion . . . ."  Ariz. R. Civ. P. 26.1(a)(6).  We review the court's decision with respect to Rule 26.1 disclosure for an abuse of discretion. *Rosner v. Denim & Diamonds, Inc.*, 188 Ariz. 431, 434 (App. 1996).  Rule 37(c) provides that if a disclosure violation has occurred, then the court must exclude such undisclosed evidence, absent good cause or a finding that the failure to disclose was harmless.  Ariz. R. Civ. P. 37(c)(1).

**¶45**         10K argues the damage model's methodology is the same.  We agree; as discussed in ¶¶ 35-36 *supra*, while Defendants challenge the but-for damages predicate, Duncan's original damages calculation provided an accurate estimate of damages.  *See* Ariz. R. Civ. P. 26.1(a)(7) (stating the plaintiff must provide a computation and measure of each category of damages alleged).  Rule 26.1 operates to exclude undisclosed evidence. *Bryan v. Riddel*, 178 Ariz. 472, 476 (1994).  A review of the record

---

[13]         After Defendants filed their motion for reconsideration of the court's October 10, 2016 ruling, the court granted 10K a twenty-day extension to file its reply.  Within the twenty-day period, 10K filed its reply but also filed a cross-motion of reconsideration.  While the language of the court's order was for a "response," 10K's cross-motion addressed the same issues raised by Defendants.  Even if 10K's response exceeded the scope of the court's order, no prejudice resulted, as Defendants filed their response to 10K's motion and were fully able to counter any arguments raised, and the court was given the opportunity to determine if 10K had exceeded the scope, but did not find so.

reveals that 10K disclosed "the subject matter" of Duncan's testimony prior to trial, "the substance of the facts and opinions" to which he testified, and "a summary of the grounds for each opinion." *See* Ariz. R. Civ. P. 26.1(a)(6). Duncan's additional declaration presented no new evidence, but instead accounted for errors in the calculation of damages based on the specific amount of damages found by the court, based on the evidence already in the record and on the model accepted by the court. *See Bryan*, 178 Ariz. at 477 ("At most, the judge should have applied Rule 26.1(c) to limit the scope of testimony to that expressed in depositions, interrogatory answers and other documents.").

**¶46**        10K presented a computation and measure of damages modeled on its ability to sell the Sun Valley Property in 2005 for profit. Based on the harm the court found, Duncan submitted his "late" declaration accounting for four necessary modifications, and based his conclusions on the court's ruling, his trial testimony, and the evidence in the record. We agree with the superior court: "The missing financial values [provided by Duncan] are in evidence and the present value calculations employ the analysis accepted by the Court at trial[,]" and added that Duncan testified at trial regarding a present value modification to account for 10K's total harm.

**¶47**        We therefore hold the court did not abuse its discretion when it accepted and relied on Duncan's additional declaration, as it would similarly have acted within its discretion to consider any post-trial motions offered by Defendants to recalculate damages to correct errors in the calculation.[14]

**¶48**        Relatedly, Defendants argue the court should have held an evidentiary hearing or status conference when it accepted Duncan's additional declaration, to give Defendants the opportunity to challenge Duncan's calculation. Given that Duncan's declaration did not introduce any new evidence and Defendants themselves submitted post-trial motions arguing for a recalculation based on the breach found, we hold the court

---

[14]    Though no error occurred, no prejudice resulted. While WVSV argues that a motion to reconsider is not an appropriate vehicle to urge a damage recalculation, WVSV argued in its own post-trial motion for reconsideration for a recalculation of the damages, based on the harm found and evidence presented at trial. Both parties argued post-trial that the court's damage calculation should be amended to correct for mathematical errors and appropriate deductions.

did not err when it declined to conduct a status conference or evidentiary hearing as requested.

II.     10K's Cross-Appeal for Declaratory Judgment

¶49     10K claims the court erred by precluding its declaratory judgment claim on an application of the election of remedies doctrine. 10K claims it is entitled to a declaration that the 2002 Agreement is invalid and seeks restorative damages in the amount of $246,000,000.

¶50     Before trial, 10K requested that the court enter findings of fact and conclusions of law. The court initially denied 10K's claim for declaratory relief, although it never selected a remedy, on the grounds it sought to both "rescind the Wolfswinkel contract *and* pursue damages[,]" and stated, "the damages sought on 10K's tort and declaratory relief claims are duplicative."

¶51     10K thereafter challenged the court's declaratory judgment conclusion on the basis that the court's December 21, 2015 ruling found that the parties had "entered into new agreements" in June 2002 to settle litigation. 10K moved to amend the court's ruling requesting the court find the 2002 Agreement was entered into without the proper consent and conclude the 2002 Agreement was therefore void or voidable at 10K's election. 10K argued its claims were not inconsistent because both claims were based on the invalidity of the 2002 Agreement, and to the extent there was an inconsistency, that the court should allow 10K to elect the remedy of its choice. 10K requested that the court make such additional findings and conclusions as necessary for appellate review, argued the court should make specific findings regarding whether the 2002 Agreement was properly consented to, and determine, even if the 2002 Agreement was not void for lack of consent, whether the 2002 Agreement should be voidable at 10K's option due to PHII's self-dealing. Defendants responded in opposition.

¶52     On September 7, 2016, the court amended its December 21, 2015 ruling to address 10K's claim that the court found the 2002 Agreement to be "new," and stated:

> 22A.     The 2002 Breycliffe Agreement reflected the valid exercise of PHII's authority to settle litigation. This authority was initially granted in the Operating and Management Agreements and remained effective throughout the valid amended and restated agreements. The 2002 Breycliffe Agreement is valid.

18

The court clarified that it did not find the 2002 Agreement to be a "new" agreement, and therefore that it was not required as a secondary consideration to determine whether consent was obtained. The court otherwise denied 10K's motion.

¶53        On appeal, 10K challenges the court's declaratory judgment claim on the basis it did not consent to the 2002 Agreement.

A.        Invalidation for Lack of Consent

¶54        We review conclusions of law *de novo*, such as issues of contract interpretation, *Earle Invs., LLC v. S. Desert Med. Ctr. Partners*, 242 Ariz. 252, 255, ¶ 14 (App. 2017), but review the court's factual findings regarding whether those obligations were met for clear error, *In re Indenture of Trust Dated Jan. 13, 1964*, 235 Ariz. 40, 48, ¶ 21 (App. 2014).

¶55        10K claims, regardless whether litigation settlement was within PHII's authority, that the management and operating agreements required 10K member consent to dispose of 10K's property, and that 10K did not consent to the 2002 Agreement disposing of their property.

¶56        The management and operating agreements require member consent to sell or otherwise dispose of 10K's assets. Such action is one of the few actions that require member consent; authority for most other actions is vested in 10K's manager, PHII, provided member consent is not specifically required. Section 2.2(g) of the management agreement and § 3.3(g) of the operating agreement authorize PHII to execute documents and instruments on behalf of 10K that are necessary to do the business of the company, after obtaining approvals if required.[15]   10K argues that because the settlement involved disposing of 10K's property, member consent was required, and that, because consent was not obtained, the 2002 Agreement is invalid.

¶57        10K's interpretation of its agreements miss their mark and are unsupported by the evidence. 10K does not challenge that it consented to the initial sale of its property to Breycliffe under the terms agreed to and articulated in the original Agreement. In contrast, the facts of the events as they occurred highlight the broad authority that was granted to PHII. PHII

---

[15]      The agreements also authorized PHII to employ legal counsel and perform all other acts as may be necessary or appropriate in pursuit of 10K's business.

negotiated and signed the Agreement on behalf of 10K, an action 10K does not contest. This action was uncontested even though some 10K members were unaware that a formal agreement had been signed, as they were passive investors; supporting the claim that they generally consented to the sale and were only generally aware of the terms of the agreement prior to giving their consent.[16]

¶58        During the next several years, as litigation commenced to resolve approval and permit delays, PHII acted within its authority by employing outside counsel and performing all actions reasonably necessary to achieve the business of 10K—the sale and disposition of the Sun Valley Property. 10K members testified they were aware of the litigation and Beus and Gilbert testified that Gilbert performed work on behalf of the parties during this time to remedy delays with zoning and permits. Gilbert testified such litigation management was within PHII's day-to-day operational authority granted by the management and operating agreements. In part and parcel of those actions, PHII's actions involved signing extensions to the original sale; extensions that Stolworthy admitted he was aware of. Gilbert testified he did not read the progress reports PHII provided, but given his access to the Agreement and knowledge of litigation, he could have reasonably discovered that extensions were entered extending the original closing dates.

¶59        While the managing and operating agreements could be read to require 10K approval before PHII could execute a document disposing of 10K's property, the evidence supports the court's finding that 10K consented to the sale of the Sun Valley Property to Breycliffe and PHII otherwise acted within its prescribed authority when it settled litigation and entered the 2002 Agreement on 10K's behalf. We note that 10K has not shown that the court's findings are clearly erroneous. In addition to the consent recognized above, we note that evidence supports a finding that, given the 10K members' knowledge of litigation, they approved of PHII's

---

[16]        "In interpreting a contract, our purpose is to determine and enforce the parties' intent[;]" to do so, we look to the plain meaning of the words in the contract as viewed in the context of the contract as a whole. *Earle Invs., LLC*, 242 Ariz. at 255, ¶ 14. Given the investors' passivity and the broad grant of authority provided to PHII, it is appropriate to interpret the agreements to conclude that, once consent was given to proceed with a specified sale, PHII had the authority to do and perform all actions necessary to bring about such a result.

litigation actions providing for the June 4 settlement that disposed 10K of its property.

¶60        Second, 10K claims the fifth closing date passed before the 2002 Agreement was entered, and that the original Agreement therefore expired, and any further agreement required member consent, which was not obtained.

¶61        While a closing date is an important element in a contract to sell land, it need not be a material element; without proof that "time is of the essence," it may be deemed to be non-material to the contract. *See Miller v. Long Family P'ship*, 151 Ariz. 306, 308 (App. 1986); *contra Andrews v. Blake*, 205 Ariz. 236, 246, ¶ 34 (2003) (stating that, because time is of the essence in an option contract, it should be included as an inherit term, even if not expressly stated).

¶62        The Agreement, dated July 24, 1998, provided that close of escrow would occur on the 30th day following the end of the Approvals Condition period, set 630 days from the opening date. The Agreement granted Breycliffe the right to extend the Approvals Condition period up to 270 days. Because of delays, the parties entered extensions of the closing date. 10K member Stolworthy stated that while PHII did not obtain majority consent for each extension, PHII communicated the reason for the extensions and advised 10K of them. 10K does not challenge those extensions. Given the delays and lack of contest to a March 2002 closing date, we conclude the evidence supports a finding that the closing date was a non-material element to the original Agreement and final 2002 Agreement. Further, litigation commenced before the expiration of the fifth amendment's closing date; its expiration in March 2002, while litigation was being settled, did not preclude PHII from binding 10K to the Agreement in June.

¶63        Third, 10K claims the 2002 Agreement was new because it materially altered terms and conditions of the original Agreement, and that because it did, consent for the 2002 Agreement was required.

¶64        At the outset we note that, in contrast to 10K's claim the 2002 Agreement "contains no language suggesting that [it] is an amendment to the [Agreement,]" the 2002 Agreement is fully titled the "Amended and Restated Agreement of Purchase and Sale" "Dated June 4, 2002." It states that it "revises and restates" the original 1998 Agreement and subsequent amendments, evincing it operates as an extension to previous amendments.

¶65            10K claims the removal of a $30,000,000 investment obligation represented a material change.  10K claims one of the primary reasons for its investment was a representation that Breycliffe would invest $30,000,000 to satisfy the Approvals Condition.   But no $30,000,000 investment obligation was included in the Agreement; its absence in the 2002 Agreement therefore does not represent a removal or change of a material term.    While the Approvals Conditions were changed between the Agreement and the 2002 Agreement, to reflect Breycliffe's ability to waive the conditions in order to close escrow, 10K has not shown that such change materially altered the contract.  Breycliffe was required to provide notice of its intention to waive the Approvals Condition if it chose to do so, the same condition 10K obtained in its 2002 Spurlock Agreement, as a measure to ensure the development and sale of land could proceed while approvals were obtained.[17]   Given the litigation history that occurred as a result of approval delay, the integration of a waiver ensured Spurlock's continued participation in the transactions, but did not materially alter the terms or purpose of the land sale deal for development and profit.

¶66            10K additionally claims: the 2002 Agreement replaced a requirement that Breycliffe assume $2,800,000 owed by Spurlock to a financial company with a requirement that Breycliffe pay $4,500,000 in cash; added mutual releases between the parties regarding past litigation; required Breycliffe to make monthly and quarterly extension payments to Spurlock; and altered remedial provisions.  The remaining changes dictate necessary amendments required before the transaction could close, and while not insignificant, in that the changes were necessary to ensure the parties' continued interest in the transaction, it has not been shown that such changes were material elements to the purpose of the transaction for 10K's benefit.  Further, 10K has not shown how such changes materially affected their rights or negatively impacted them; many of the changes reflect obligations solely affecting Breycliffe's relationship with Spurlock.  Because the 2002 Agreement was not "new," PHII was not obligated to obtain separate consent when it signed the 2002 Agreement.

¶67            Finally, 10K claims it could not have consented because its decision to enter the 2002 Agreement was made without full disclosure of

---

[17]      10K claims PHII did not disclose that the 2002 Agreement gave Breycliffe the ability to waive the Approvals Conditions, but acknowledges it received letters throughout the litigation settlement period, and did not contest that it received particular letters that stated, "The Buyer must complete the Close of Escrow after the Buyer satisfies or waives the Approvals Condition."

material facts that would reasonably affect the principal's judgment. As previously stated, 10K members do not contest that they consented to the Agreement, received progress reports and updates from PHII through 2002, or that the extensions were valid. Nor does 10K show it was not informed of all material elements of the 2002 Agreement. While PHII did not disclose that it was acting to effectuate the sale of Breycliffe's interest, the existence of dual agency alone is insufficient on its own to establish a breach, *see Manley v. Ticor Title Ins. Co. of Cal.*, 168 Ariz. 568, 573 (1991), as discussed *infra*, and given the evidence presented, we cannot say the court erred in separating the purported breaches and finding that PHII's breaches were associated with the Assignment. The evidence established that 10K consented to the original sale and that PHII's further actions were conducted within their authority to bring about 10K's goals.

¶68 Substantial evidence supports the court's findings that the 2002 Agreement was not "new," that consent to the 2002 Agreement was not required, that the ability to settle litigation was within PHII's authority, and therefore that the 2002 Agreement was valid. We affirm the court's finding that the 2002 Agreement was valid.

### B. Election of Remedies Application

¶69 Because 10K failed to prove the 2002 Agreement lacked consent, and thus failed to prove it should have prevailed on its declaratory judgment claim, we need not consider whether the court erred when it denied 10K's claim on an application of the election of remedies doctrine. *See Caruthers v. Underhill*, 235 Ariz. 1, 7, ¶ 24 (App. 2014) (stating that where only one remedy exists, "the concept of an election is meaningless").

¶70 We affirm the court's denial of 10K's declaratory relief claim.

### III. 10K's Damages Calculation on Aiding and Abetting Claim

¶71 10K argues it is entitled to damages based on PHII's wrongful execution of the 2002 Agreement. 10K seeks lost-profits as stated in Duncan's original damage calculation of $288,000,000, based on a breach in entering the 2002 Agreement, instead of the court's lost-profits damage calculation of $225,000,000, based on the Assignment breach. To prevail, 10K must show the court clearly erred when it awarded damages based on the breach found, an implicit finding that 10K failed to prove damages related to a breach associated with the 2002 Agreement.

¶72 While 10K pursued its damages claim on the ground PHII acted in a continuous scheme, the determination whether the facts support

such a claim is within the discretion of the superior court, and we will reverse only if such findings are clearly erroneous. *See Tobias*, 196 Ariz. at 420, ¶ 7. We do not reweigh the evidence or evaluate the credibility of witnesses on appeal, *Brown v. U.S. Fid. & Guar. Co.*, 194 Ariz. 85, 92, ¶ 36 (App. 1998), and will not reverse the court's findings simply based on the existence of conflicting evidence, *In re U.S. Currency*, 199 Ariz. at 295, ¶ 9.

**¶73** After trial, Defendants moved for JMOL on the grounds 10K failed to establish the elements of aiding and abetting based on 10K's scheme theory, which required proof that (1) PHII breached its duty, (2) Defendants knew of the breach, (3) Defendants substantially assisted the breach, (4) there was a causal relationship between the assistance and breach, and (5) the breach injured 10K. *See Pope*, 219 Ariz. at 490-91. To sustain the court's implicit denial of 10K's claim that Defendants aided and abetted a breach associated with the 2002 Agreement, singularly or as part of a continuous scheme, we need only find evidence supporting the lack of proof of an element of the claim. *See Thomas*, 142 Ariz. at 390 (stating that we "may infer from any judgment the findings necessary to sustain it if such additional findings do not conflict with express findings and are reasonably supported by the evidence").

**¶74** 10K points to the following events to support its claim that PHII's breach was a continuous scheme: PHII marketed Breycliffe's position to third parties before it entered the 2002 Agreement and did so without advising 10K; PHII pursued profit participation from the third-party purchaser of Breycliffe's position; PHII settled litigation by entering 10K into the 2002 Agreement without disclosing information that Breycliffe could not financially perform or that PHII served as Breycliffe's manager as well; PHII stipulated to the later-vacated Mangum Judgment;[18] and PHII

---

[18] 10K claims the court's findings are irreconcilably inconsistent. The court's findings, supporting its conclusions, stated that the parties entered into the 2002 Agreement and stipulated to a "Final Judgment and Permanent Injunction Order," before Judge Mangum, which incorporated the terms of the 2002 Agreement and ordered the parties to perform their contractual obligations. The 2002 Agreement linked its release of litigation to the stipulated court judgment. This court found the Mangum judgment was procured by fraud, *see Cal X-Tra*, 229 Ariz. at 393-96, 398, ¶¶ 51-62, 71-72, but that does not preclude the superior court from finding PHII did not breach its fiduciary duties when it entered 10K into the 2002 Agreement. *See id.* at ¶¶ 53-54 (stating 10K's burden to vacate a prior judgment was a *prima facie* showing of a meritorious defense as necessary to defeat

brokered the Assignment against 10K's directive and without proper disclosure.

¶75            The court found the 2002 Agreement valid, as a proper exercise of PHII's authority, and concluded that, based on the evidence, PHII breached its duties to 10K when it shopped Breycliffe's interest during the Assignment to Defendants.  The court's findings implicitly require that it found 10K failed to prove damages associated with the 2002 Agreement or a continuous scheme.  *See John C. Lincoln Hosp. & Health Corp. v. Maricopa County*, 208 Ariz. 532, 540, ¶ 23 (App. 2004) ("Implied in every judgment, in addition to express findings made by the court, is any additional finding that is necessary to sustain the judgment, if reasonably supported by the evidence, and not in conflict with the express findings.") (citation omitted); *Switzer Bros. v. Locklin*, 297 F.2d 39, 45 (7th Cir. 1961) (stating the court can interpret a failure to adopt findings as an implicit rejection of a position taken).  Evidence supports the court's implicit findings and conclusion.

¶76            10K claims PHII failed to disclose its dual-agency relationship.  While evidence supports a possible finding that PHII acted as a dual agent to 10K and Breycliffe, the existence of a dual-agent relationship does not by itself prove breach.  *See Manley*, 168 Ariz. at 573 (stating that dual agency, by itself, is not the equivalent to acting adverse of a principal's interest).  There must be further proof that such dual agency resulted in action against the principal's interest.  *Id.*  Evidence indicates PHII acted in 10K's best interest when it entered the 2002 Agreement.  Testimony indicates the Spurlock property was valuable to the later development of 10K's land.  An appraisal conducted in May 2002 valued 10K's land, without Spurlock's, at $3,402 per acre.  10K believed it could have moved forward with Spurlock without Breycliffe, but 10K had no contractual right to Spurlock's property, nor was it guaranteed that Spurlock would move forward with 10K given the litigation that had occurred.  The 2002 Agreement committed Spurlock to the transaction and guaranteed that 10K would receive $5,000 per acre for their land plus 20% of future profits.

¶77            While 10K claims $5,000 per acre was below market value in June 2002, 10K members testified they received monthly progress reports

summary judgment).  Nor does the evidence indicate Breycliffe would have sold its interest to 10K because it was financially unable to complete the transaction, *see supra* section III, require a finding that entering 10K into the 2002 Agreement was against their interest or the product of a breach of PHII's fiduciary duties, although it may serve as evidence of such.  The court's explicit and implicit findings do not conflict.

that detailed the disputes with Spurlock, hiring of legal counsel, and negotiations through April 2002. 10K's managing and operating agreements granted PHII authority to perform acts necessary to achieve its business objectives, and Gilbert testified management of litigation was within PHII's authority. Litigation commenced before the expiration of the fifth amendment's closing date in March 2002, and during litigation, disputes arose whether Spurlock would grant another extension without Breycliffe's involvement. For these reasons, and more, evidence supports a finding that PHII managed litigation and settled the 2002 Agreement in 10K's best interest, such that we cannot say the court erred when it implicitly denied 10K's claim Defendants aided and abetted a breach associated with the 2002 Agreement.

¶78        Further, evidence supports a finding that PHII's self-dealing motivation arose separate from the 2002 Agreement. PHII created its separate management company, SV Investments, when it believed it could obtain management rights and profit participation from Breycliffe's purchaser in assignment. Evidence supporting PHII's breaches reflect its actions were associated with selling Breycliffe's interest, including contesting the disclosure of documents exposing their relationship with Breycliffe, but it is not indisputable that such actions formed a continuous scheme to divest 10K of its property, nor does it support the inference that PHII's breaches concerned the 2002 Agreement, and not the Assignment. The court received evidence and was in the best position to determine the credibility of witnesses. Given the conflicting evidence, we cannot say the court's findings and conclusions are clearly erroneous.

¶79        Lastly, 10K claims the damage award should reflect lost profits associated with the 2002 Agreement, as PHII did not have the unfettered discretion to enter the 2002 Agreement. For the reasons discussed regarding the validity of the 2002 Agreement in ¶¶ 54-68 *supra*, we find 10K's argument unpersuasive.

¶80        Because 10K's challenge to the damage award rested on the court finding PHII breached its duties when it entered the 2002 Agreement, which we hold were not clearly erroneous, we affirm the court's damage award.

IV.    Attorneys' Fees

¶81        Defendants argue the court erred by awarding 10K fees pursuant to A.R.S. § 12-341.01 as 10K's tort claim did not "arise out of a contract."

¶82 We review questions regarding the interpretation and application of the attorney fee statute *de novo*, but if fees are available, we review the award for an abuse of discretion. *Dooley v. O'Brien*, 226 Ariz. 149, 152, ¶ 9 (App. 2010).

¶83 Not every claim that relates to a contract arises out of a contract for the purpose of deciding the applicability of an award of attorneys' fees. *Id.* at ¶ 11. A claim arises out of a contract when the duty breached is created by the contractual relationship and would not exist "but for" the contract, in contrast to those situations when the duty breached is implied by law based on the relationship of the parties, for that claim will sound in tort, not contract. *Id.* at ¶¶ 11-12.

¶84 In the present case, the court found some of PHII's fiduciary duties were created by its contractual relationship with 10K to serve as 10K's manager. The court found PHII acted contrary to the management and operating agreements and breached its duties through self-dealing in assigning the Breycliffe interest to Defendants; PHII contracted to receive 40% of profits obtained from the sale of land per Breycliffe's interest. Those breaches caused Breycliffe to sell its interest to Defendants instead of 10K. We agree. As such, we hold that the court did not err in awarding attorneys' fees pursuant to A.R.S. § 12-341.01 as arising out of a contract.

## CONCLUSION

¶85 For the foregoing reasons, we affirm the court's rulings granting damages to 10K on its aiding and abetting a breach of fiduciary duty claim and denying 10K's declaratory judgment claim.

¶86 Both parties request costs on appeal pursuant to Arizona Rule of Civil Appellate Procedure ("ARCAP") 21, and if we affirm the court's determination that 10K's claim arises out of contract, attorneys' fees pursuant to A.R.S. § 12-341.01. Given the discretion granted this court pursuant to § 12-341.01, we decline to award either party their reasonable attorneys' fees on appeal. We do, however, determine 10K to be the prevailing party on appeal and award them their costs pursuant to ARCAP 21.