IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

EARLE INVESTMENTS, LLC, an
Arizona limited liability,
*Plaintiff/Counterdefendant/Appellee,*

*v.*

SOUTHERN DESERT MEDICAL CENTER
PARTNERS, an Arizona general partnership,
*Defendant/Counterclaimant/Appellant.*

No. 1 CA-CV 15-0507
FILED 4-13-2017

Appeal from the Superior Court in Maricopa County
No.  CV2013-015653
The Honorable David O. Cunanan, Judge

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART**

COUNSEL

Combs Law Group, PC, Phoenix
By Christopher A. Combs, Alexandra E. Fugate
*Counsel for Plaintiff/Counterdefendant/Appellee*

Dickinson Wright, PLLC, Phoenix
By Michael R. Scheurich, Maggie E. Wood
*Counsel for Defendant/Counterclaimant/Appellant*

_____

**OPINION**

_____

Presiding Judge Diane M. Johnsen delivered the opinion of the Court, in which Judge Jon W. Thompson and Chief Judge Michael J. Brown joined.

_____

**J O H N S E N**, Judge:

¶1          We address in this case the effect of broadly written subordination agreements a landowner executed in support of deeds of trust that secured loans made to the owner of some commercial condominium units situated on the owner's land.  We conclude the subordination agreements functioned as conveyances of the landowner's interest in the encumbered property, and vacate and remand the superior court's judgment to the extent it is inconsistent with that conclusion.

**FACTS AND PROCEDURAL BACKGROUND**

¶2          In January 1974, Duane P. Alleman, on behalf of Du Paul Ltd. ("Du Paul"), conveyed by warranty deed a fee-simple interest in land located in Tempe to Arizona Title Insurance and Trust Company ("Arizona Title").  In 1976, Arizona Title then leased a portion of the land to Duane P. Alleman, acting on behalf of Southern Desert Medical Center, Inc., "Phase II" ("SDMC Inc.").

¶3          The 50-year lease stated that SDMC Inc. could use the land "only for the purpose of operating and maintaining offices for medical and dental and related services."  SDMC Inc. was to pay all taxes and assessments and rent of $1,250 per month.  Additionally, the lease provided it was "UNDERSTOOD AND AGREED that the lease-hold interest of the Lessee may be enrolled in a Horizontal property Regime" pursuant to Arizona Revised Statutes ("A.R.S.") section 33-551 (1976).  The lease specified that SDMC Inc. could convey "Units" of its leasehold estate under such a horizontal property regime.  Each such conveyance would include a proportionate interest in the "Common Areas" of the horizontal property regime.  The lease provided that Unit owners would be responsible for their respective shares of rent, taxes and assessments due under the lease.  The lease further set out remedies available to Arizona Title as lessor in the event of a breach by a Unit owner.  Among other things, Arizona Title could "terminate this Lease as to that portion of the premises on which the leasehold estate is owned by such [Unit owner]."

¶4 The lease also addressed respective rights and obligations with respect to security interests. First, SDMC Inc. agreed that its leasehold interest would be subordinate to any mortgage or deed of trust placed on Arizona Title's interest in the property, with the proviso that the lease would remain in full force and effect notwithstanding any default. The lease also addressed the possibility that an owner of a Unit might want to post its interest as security for a loan:

> Lessor may, in its sole discretion, but it shall not be obligated to, subordinate its interest in portions of the real estate to the lien of a mortgage or Deed of Trust granted of [sic] the grantee of the leasehold estate in one or more Units under a Declaration of Horizontal Property Regime. In such event, however, the subordination shall be only as to the property upon which the leasehold estate is owned by such grantee, and appurtenant interest in the Common Areas.

¶5 On the same day it entered into the lease with Arizona Title, SDMC Inc. established a horizontal property regime on the parcel. The Declaration that established the regime recited that Arizona Title was the owner of fee-simple title to the land and that, pursuant to its lease, SDMC Inc. was "the owner of the leasehold estate in and to the aforedescribed property, subject to the provisions of said Lease." The Declaration further recited that SDMC Inc. was constructing on the parcel a professional building project that was to be known as Southern Desert Medical Center, Phase II, which "shall be held, sold and conveyed" subject to the Declaration. The regime was to last until the 50-year lease from Arizona Title expired.

¶6 As provided in the Declaration, SDMC Inc. was to divide the project into "Units and "Common Elements." The Declaration defined "Unit" to mean "a separate leasehold estate, consisting of the space bounded by and contained within the perimeter walls, floors, ceilings and windows of each Unit." The Declaration specified that "Common Elements" and "Common Area" were "synonymous," and meant "each multi-office structure, except for the Units, the earth upon which the structure is located and the air space above, the interior surface of the ceiling of the structure," and, inter alia, all bearing walls, roofs, ceilings, floors, foundations, storage spaces, patios, lobbies, carports, parking spaces, pipes, wires. Further, ownership of a "condominium" within the meaning of the Declaration would include "the leasehold interest in a Unit," along with an undivided interest in the Common Areas. Finally, the Declaration specified that each condominium was "a separate parcel of real property which may be

conveyed, transferred and encumbered in the same manner as any other parcel of real property, independently of all other parts of the property, subject only to the provisions of this Declaration and the underlying Lease."[1]

¶7        On June 28, 1977, Duane P. Alleman, acting on behalf of SDMC Inc., conveyed to Duane P. Alleman, in his personal capacity, two suites of condominiums under the regime, designated as numbers 1 through 34 of Building "G" and numbers 40 through 59 of Building "I."  The warranty deed described the real property to be conveyed as the Units, "TOGETHER with an undivided . . . interest in and to the Leasehold Estate in and to the subject Real Property, and TOGETHER with [an undivided] interest in the common areas," all as set forth in the Declaration.  Two days later, to secure financing for tenant improvements, Alleman granted a lender a security interest in each of the two suites through identical deeds of trust.  The same day, Arizona Title, as owner/lessor, and SDMC Inc., as lessee, executed two identical Subordination Agreements.  The particulars of the Subordination Agreements are set out *infra* ¶¶ 15, 23, 25, 29.

¶8        Two years later, Arizona Title conveyed to Du Paul by special warranty deed its fee-simple title in and to the land that was subject to the lease between Arizona Title and SDMC Inc.  On the same day, Du Paul conveyed the same interest to Southern Desert Medical Center Partners ("Partners") by warranty deed.  At that point, therefore, Partners became the owner/lessor of the parcel of land, subject to whatever rights, benefits or obligations were imposed or granted by the Subordination Agreements.

¶9        In July 1997, the lender foreclosed on the deeds of trust securing construction of Alleman's two suites of Units.  The condominiums were sold at a trustee's sale, and later conveyed to a second entity, which,

---

[1]        Consistent with the Declaration, ownership of a condominium generally means ownership of a horizontal layer of cubic content space, subject to the owner's exclusive control, together with a fractional interest held in common with other unit owners in the common elements. *Makeever v. Lyle,* 125 Ariz. 384, 386 (App. 1980), *citing* former A.R.S. § 33-553(3).  The common elements include "the land, the foundations, floors, the exterior walls of each [unit], ceilings and roofs, and in general all that portion of the property other than that which is subject to the exclusive ownership and control of an individual [unit] owner."  125 Ariz. at 386, *citing* former § 33-551(6).

on November 7, 2001, conveyed the Units by warranty deed to appellee, Earle Investments, LLC ("Earle").

¶10 Even though it was an owner of Units ostensibly subject to the Lease, Earle paid no rent to Partners, the owner/lessor, until 2012, when it agreed to pay six years' back rent of $35,481.07 for Units 1 through 34 of Building "G" and $20,871.21 for Units 40 through 59 of Building "I." Thereafter, Earle made rent payments for several months, then stopped, asserting that, under the Subordination Agreements and as a result of the foreclosure sales in July 1997, it held a fee simple interest in the land occupied by the Units. It argued that when the lender foreclosed, the owner/lessor's fee-simple interest in the land on which the Units were situated was extinguished.

¶11 In November 2013, Earle filed a complaint against Partners, asking the court, among other things, to quiet title in favor of Earle. In due course, the superior court granted Earle's motion for summary judgment, finding Earle had "good and valid and inclusive of full fee simple title" in "Units 1 through 34, inclusive, of Building G, and Units 40 through 59, inclusive, of Building I." The court also ruled that Earle's title to the Units was not subject to the Lease, and therefore "enjoined, estopped, and barred [Partners] from asserting any claim, estate, right, title, or interest whatsoever in or to the land or premises, or to any part thereof, adverse to . . . Earle."

¶12 Partners timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. § 12-2101(A) (2017).[2]

## DISCUSSION

### A. Legal Principles.

¶13 Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). We review a grant of summary judgment *de novo*, viewing the facts and inferences drawn therefrom in the light most favorable to the party against which judgment was entered. *Corbett v. Manorcare of Am., Inc.*, 213 Ariz. 618, 621-22, ¶ 2 (App. 2006).

---

[2]    Absent material revision after the relevant date, we cite a statute's current version.

**¶14**     The interpretation of a contract is a matter of law, which we review *de novo*. *Rand v. Porsche Fin. Servs.*, 216 Ariz. 424, 434, ¶ 37 (App. 2007). In interpreting a contract, our purpose is to determine and enforce the parties' intent. *US W. Commc'ns, Inc. v. Ariz. Corp. Comm'n*, 185 Ariz. 277, 280 (App. 1996). In determining the parties' intent, we "look to the plain meaning of the words as viewed in the context of the contract as a whole." *United Cal. Bank v. Prudential Ins.*, 140 Ariz. 238, 259 (App. 1983).

## B.     Subordination Agreement or Deed of Trust.

**¶15**     Each of the two Subordination Agreements expressly provided that the related deed of trust "shall unconditionally be and remain at all times a lien, charge, and encumbrance upon the Property prior and superior to any right, title, or interest in or to the Property of Owner or Lessee." Earle argues the Subordination Agreements effectively conveyed the owner/lessor's fee-simple interest in the Property; as the current owner/lessor, Partners argues the Subordination Agreements encumbered only the leasehold estate.

**¶16**     Our analysis is informed by a handful of cases from other jurisdictions, the first being *Old Stone Capital Corp. v. John Hoene Implement Corp.*, 647 F. Supp. 916 (D. Idaho 1986), which addressed a question very similar to the one here. As here, the lessee had granted a lender a deed of trust on its lease interest in some commercial property, and, at the lessee's request, the owner/lessor executed a subordination agreement. After the lessee defaulted and the lender sought foreclosure, the question was whether the owner/lessor had subordinated her fee interest or only her lease interest in the property subject to the deed of trust. *Id.* at 917. The owner/lessor argued she agreed to subordinate only her leasehold interest in the property, "as that was the only interest which was the subject of the leasehold mortgage" that the lessee had executed. *Id.* As in this case, the owner/lessor's argument was that "the subordination agreement could only prioritize the interest which [the lender] had, and the only interest which it had was in the leasehold." *Id.*

**¶17**     The court agreed with the owner/lessor. It explained that "the nature of a subordination is such that the beneficiary of the subordination must have a competing interest which, after the subordination, becomes senior to that which, before the subordination, was the senior interest." *Id.* at 919. As applied, the only interest the security agreement granted the lender in that case was in the lessee's leasehold. After the subordination, therefore, the lender's interest in the lease became superior to the owner/lessor's interest in the lease. *Id.* But "[b]y its very

nature, the vehicle of subordination could not be used to grant [the lender] an interest in the fee." *Id.* Significantly for our purposes, however, the court observed that the lender might have acquired an interest in the owner/lessor's fee if the owner/lessor had executed what amounted to a mortgage or a deed of trust. *Id.* There was no dispute in that case that the subordination agreement lacked the formalities state law required for a mortgage or deed of trust. *Id.*

¶18        Applying the same logic, the court in *Republic National Life Ins. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 357 (Minn. 1979), held that an agreement that "[t]he interest of the Lessors in the leased premises . . . shall be junior and subordinate to the interest of [the lender]" did not subordinate the owner/lessor's fee interest. The court explained, "Ground lessors manifestly intended to retain their fee interest, and only if they themselves mortgaged the fee would the lessee's mortgagees have priority over the fee." *Id.* at 355.

¶19        In *Matthews v. Hinton*, 234 Cal. App. 2d 736 (1965), the court addressed the same issue but held for the lender because it concluded the owner/lessor *had* joined in the deed of trust. The court began its analysis by describing the economics of the situation: "The lessees or sublessees might have attempted to put up their tenancy for years as security for construction loans. A fee simple estate would be far more attractive security to a lender." *Id.* at 741 (citation omitted). While the relevant security agreements in *Old Stone* and *Lorraine* did not purport to convey the owner/lessor's fee interest, the deed of trust in *Matthews* did just that: By expressly joining with the lessees as "trustor," the owner/lessor "contracted directly with the lender, exposing [its] reversionary interest to direct liability independently of auxiliary collection attempts against the borrowers." *Id.*

¶20        The court in *Travelers Ins. v. Holiday Village Shopping Cemter Ltd. Par.*, 931 P.2d 1292 (Mont. 1996), applied a similar analytical framework in reversing summary judgment entered in favor of the lender. The subordination agreement in that case recited that the lender was "unwilling to make said loan or advance funds thereon unless it is assured that the [mortgage granted by the lessee] shall be a lien upon the [owner/lessor's] fee simple title in the hereinbefore described real property . . . ." *Id.* at 1295. The agreement continued:

> WHEREAS, the undersigned [owner/lessor] is willing to subordinate its fee simple title to said real property to said mortgage and is willing to give such assurance,

> NOW, THEREFORE, in consideration of the making of said loan . . . the undersigned hereby subordinates all of its right, title and interest in and to said real property to the lien of said mortgage and agrees that said mortgage shall continue to be a first lien upon said property prior and superior in right to any right, title and interest of the undersigned in and to said real property.

*Id.* at 1295.

¶21    The Montana Supreme Court reversed the trial court's entry of summary judgment in favor of the lender, holding that the agreement was ambiguous. *Id.* at 1296. In explaining the ambiguity, the court noted that although the subordination agreement recited that the owner/lessor's *fee interest* was to be "subordinated," it contained no language purporting to mortgage the property to the lender as security. *Id.* The court explained, "A subordination agreement only dictates the priorities between existing interests, for example lien holders – it does not mortgage an interest in the property. A mortgage 'is a contract by which specific property is hypothecated for the performance of an act, without the necessity of a change of possession.'" *Id.* (citation omitted).

¶22    Applying the principles of these decisions to this case, the first question is whether the two Subordination Agreements functioned as mortgages or deeds of trust that conveyed the owner/lessor's fee interest in some property. We say "some property" because the somewhat awkward wording of the Subordination Agreements requires our analysis to proceed in stages.

¶23    To begin with, the "whereas" clauses at the beginning of each of the Subordination Agreements broadly describe facts leading up to execution of the document. In particular, the fourth such clause recites that "it is a condition precedent to making said loan that the Deed of Trust shall unconditionally be and remain at all times a lien, charge, and encumbrance upon the Property prior and superior to any right, title, or interest in or to the Property of Owner . . . ." But the dispositive language is paragraph (2), which states:

> The Deed of Trust and the Note, and renewals or extensions thereof, shall unconditionally be and remain at all times a lien, charge, and encumbrance on the Property prior and superior to any right, title, or interest therein of Owner . . . . *For the purpose of giving effect to this subordination, Owner . . . consent[s]*

*to and join[s] in the Deed of Trust and hereby grant[s], transfer[s], and assign[s] to the Trustee of the Deed of Trust all right, title, and interest of Owner . . . in and to the Property, in trust pursuant to the Deed of Trust with the power of sale*, it being understood that such power of sale shall be exercised only in connection with the enforcement of the Deed of Trust.

(Emphasis added.)

**¶24** Guided by the authorities discussed above, we hold that by agreeing to this provision, the owner/lessor did more than subordinate the leasehold to the lender; it conveyed all of its right, title and interest, namely its fee interest, "in and to the Property" in trust as security for debt. That is the effect of the owner/lessor's joining in the deeds of trust and expressly "grant[ing], transfer[ring], and assign[ing]" all of its "right, title, and interest" to the trustee.[3]

**¶25** Partners argues this conclusion disregards the provision in Exhibit A to the subordinations that the conveyances in the deeds of trust shall be "SUBJECT TO" the lease. Reading the body of the Subordination Agreements together with the property description, however, the owner/lessor's joinder in the deeds of trust supersedes the "subject to" provision in the property description. That is, Exhibit A acknowledges that the property the *Unit owner* is conveying as security is subject to the lease; by joining in the deeds of trust and conveying all of its "right, title, and interest" in the property, the *owner/lessor* conveyed its fee-simple interest in the described property.

**¶26** Partners further argues that the Subordination Agreements cannot be construed as deeds of trust because they lack a sufficient legal description. As Earle points out, however, Exhibit A to the Subordination Agreements contains a legal description of the property conveyed. Those documents describe the property by reference to the Declaration of Horizontal Property Regime and specify the docket and page number on which the description is recorded. The Subordination Agreements therefore adequately described the property. *See Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 230 Ariz. 314, 324, ¶ 33 (App. 2012).

---

[3] Given the passage of time, neither party offers any extrinsic evidence of the intent of the parties to the Subordination Agreements; nor does Partners argue there are disputed issues of fact as to their meaning.

¶27        For these reasons, we hold that by executing the documents labeled "Subordination Agreement," the owner/lessor conveyed its fee interest "in and to the Property," in trust as security for the Unit-owner's debt.

## C.        The "Subject Real Property."

¶28        The conclusion that the Subordination Agreements effectively conveyed the owner/lessor's fee interest "in and to the Property" leaves open precisely what "Property" was conveyed.  Earle argues the superior court correctly ruled that when the lender foreclosed, it took fee title to the land beneath the Units that secured the debt.  The cases cited above do not answer this question because they involved simple commercial leases, not commercial condominiums as are at issue here.

¶29        Returning to the language of the Subordination Agreements, the key provision is, as we have said, the owner/lessor's consent and joinder in the deeds of trust so as to "grant, transfer, and assign to the Trustee of the Deed of Trust all right, title, and interest of Owner . . . in and to the Property, in trust pursuant to the Deed of Trust . . . ."  The Subordination Agreements define "the Property" to mean the property described in an attached "Exhibit A."  In turn, Exhibit A to each of the Subordination Agreements describes the Property as: (1) the specified "Units" as recorded in the Declaration; (2) "TOGETHER with an *undivided [fractional] interest* in and to the Leasehold Estate in and to the subject Real Property," and (3) "TOGETHER with a [fractional] interest in the common areas and facilities as set forth in said Declaration."  (Emphasis added.)

¶30        None of the three elements of the described "Property" includes the ground beneath any particular Unit or Units.  Earle argues that the second item – the "interest in and to the Leasehold Estate in and to the subject Real Property" means the land beneath the Units it owns.  But that interpretation unduly stretches the language of the property description: The interest specified in Exhibit A is an *undivided fractional interest* in "the Leasehold Estate in and to the subject Real Property."  Thus, when the lender foreclosed, it received (1) the Unit-owner's interest in the Units (as defined by and subject to the Declaration), (2) an undivided fee-simple interest in the leasehold estate "in and to the subject Real Property," and (3) an undivided fee-simple interest in the Common Areas and facilities, as set forth in the Declaration.

¶31        In support of the superior court's ruling that the lender took fee-simple title to the land beneath the Units subject to the deeds of trust,

Earle points to the provision in the lease, *supra* ¶ 5, stating that the owner/lessor "may . . . subordinate its interest in portions of the real estate" to a Unit-owner's lender. As Earle notes, the lease continues, "In such event, however, the subordination shall be only as to the property upon which the leasehold estate is owned by such grantee, and the appurtenant interest in the Common Areas."

**¶32** The lease provision Earle cites reserves the owner/lessor's right to subordinate on certain terms, but does not preclude the owner/lessor from agreeing to subordination on terms less favorable to a lender. Under the circumstances, we cannot construe the lease provision to broaden the express terms of the Subordination Agreements. If the parties had intended that the owner/lessor would subordinate its interest in "the property upon which the leasehold estate is owned" by a Unit-owner, we presume they would have so stated in the Subordination Agreements. The reference in Exhibit A to an "undivided interest," which is incorporated into the Subordination Agreements by the Subordination Agreements' references to the exhibit as defining the encumbered property, cannot be read to refer to a fee-simple interest in the land on which any specific Units are situated.

**¶33** In summary, we conclude that in executing the Subordination Agreements, the owner/lessor conveyed to the lender, in trust as security for repayment of the loan to the Unit-owner, an undivided fractional fee-simple interest in the entire parcel of property that was the subject of the Lease. In foreclosing on the Deed of Trust, the lender therefore succeeded to an undivided fractional fee-simple interest in that property, and after foreclosure, the lender owned the relevant Units and the associated undivided fractional fee-simple interests in the leasehold and "Common Areas" and facilities. Since its fee-simple interest was free and clear of the owner/lessor's interest in the leasehold, the lender and its assigns were not subject to the lease or any rent obligation. But they did not gain a fee-simple interest in any particular portion of the land subject to the Lease; instead, their interest is an undivided fractional fee-simple interest in the entire subject property. Moreover, just as the owner/lessor's interests were subject in the first instance to the Declaration, the interests to which the lender took title (and which now are owned by Earle) remain subject to the Declaration. Accordingly, Earle is subject to the obligations spelled out in the Declaration (other than the obligation to pay rent under the lease).

## D.    Ratification.

¶34    We have held that upon foreclosure, the lender obtained a fee-simple interest in the property, unencumbered by the lease. Partners argues, however, that Earle ratified the lease by making rent payments. But the cases on which Partners relies do not support the proposition that a lease obligation may be created in the first instance by payments denominated as rent. *See All-Way Leasing, Inc. v. Kelly*, 182 Ariz. 213, 217 (App. 1994) (rejecting contention that wife had ratified contract executed by husband, so as to bind the community); *Young Mines Co. v. Citizens' State Bank*, 37 Ariz. 521, 528-29 (1931) (ratification is "subsequent approval by a principal of a previous unauthorized act by one claiming to act as an agent"). Partners also cites Restatement of Contracts (Second) § 380 (1981), but that provision concerns acts by which one may ratify a contract that is voidable. *See id.* ("Loss of Power of Avoidance by Affirmance"). As we have said, upon the lender's foreclosure, the lease was not voidable as to the lender and its assigns, but void.[4]

## CONCLUSION

¶35    For the reasons stated, we affirm the judgment to the extent it provides that Earle owns the Units and an undivided fractional fee-simple interest in the property identified in the Lease and is not subject to the obligations of the Lease. We otherwise reverse and remand the judgment to the superior court so that it may enter a revised judgment consistent with this opinion. Because neither side has substantially prevailed in this appeal, we deny both sides' requests for fees and costs. *See* A.R.S. §§ 12-341.01 (2017), -342 (2017).



AMY M. WOOD • Clerk of the Court
FILED:  AA

---

[4]    Our decision to address the ratification issue on the merits renders moot Partners' contention that the superior court erred by declining to consider Partners' reply in support of its second motion for reconsideration.