NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ALAN SCHAPKER, *Plaintiff/Appellee,*

*v.*

ELIZABETH KETZLER-NAUGHTON, et al., *Defendants/Appellants.*

No. 1 CA-CV 23-0309
FILED 08-20-2024

Appeal from the Superior Court in Maricopa County
No. CV2019-002654
The Honorable Dewain D. Fox, Judge

**AFFIRMED IN PART, REVERSED IN PART**

COUNSEL

Fennemore Craig, P.C., Phoenix,
By William G. Klain, Zachary W. Rosenberg
*Counsel for Plaintiff/Appellee*

Campbell, Yost, Clare & Norell, P.C., Phoenix
By Renee Coury
*Counsel for Plaintiff/Appellee*

Lang Thal King & Hanson, PC, Scottsdale
By George H. King, Andrew J. Wenker
*Counsel for Plaintiff/Appellee*

Udall Shumway PLC, Mesa
By H. Micheal Wright, Lincoln M. Wright
*Counsel for Defendant/Appellants*

---

**MEMORANDUM DECISION**

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Jennifer M. Perkins and Judge David D. Weinzweig joined.

---

**J A C O B S**, Judge:

¶1  Josephine Naughton ("Josie") was severely injured when she was born on February 10, 2004, at Bethany Womens Healthcare ("BWH"), a birthing center owned by obstetrician Dr. Alan Schapker. BWH's midwife Lynnette Casey attended her birth. In 2016, Schapker sold BWH to three doctors in a Sale Agreement that obligated him to indemnify them against claims but barred the doctors from assigning the agreement or their rights under it. In a 2017 suit, Josie's parents Shawn and Elizabeth sued Schapker, BWH, and Casey over Josie's injuries. In 2018, the Naughtons agreed to settle their claims against BWH and Casey for $8.5 million, intending that Schapker pay that sum. BWH and Casey attempted to tender the defense of the Naughtons' claims to Schapker, a process called "vouching in." Schapker refused the tender. The court later dismissed the 2017 suit.

¶2  In this suit, Schapker sought a declaration that the Sale Agreement did not obligate him to indemnify BWH and Casey for the Naughtons' claims arising from Josie's injuries. The court entered a Rule 54(b) judgment for Schapker, ruling: (1) the Sale Agreement barred BWH from assigning to the Naughtons its claims against Schapker arising out of Josie's birth; (2) the Naughtons had not made Schapker an indemnitor for Josie's injuries by seeking to vouch him into the since-dismissed personal injury suit; (3) the Naughtons were not entitled to recovery from Schapker in light of any alleged duty on his part to maintain tail coverage that could have satisfied claims relating to Josie's birth; and (4) Schapker properly sued Elizabeth, a party to the settlement, for declaratory relief.

¶3  Because the Sale Agreement may allow BWH to assign its claims against Schapker arising out of Josie's birth, we reverse the partial summary judgment on those claims and the related fee award. Yet we affirm the rest of the Rule 54(b) judgment because: (1) the Naughtons sought only to vouch Schapker into a case that was later dismissed; (2) the Naughtons never obtained the probate court's approval required to settle a minor's claims; (3) Schapker did not owe BWH or Casey a duty to maintain tail coverage; and (4) Elizabeth is a proper party to this suit.

**FACTS AND PROCEDURAL HISTORY**

### A. Josie Was Born with Severe and Permanent Injuries at a Birthing Center Schapker Owned and Operated, After Which Insurance Coverage for Related Claims Lapsed.

¶4 On February 10, 2004, Josie was born at BWH. Casey, BWH's Certified Nurse Midwife, managed the labor and delivery. Schapker was not present for Josie's birth and did not personally provide healthcare to the Naughtons. Josie suffered brain hypoxia, causing her to develop cerebral palsy. She now requires full-time care, which Elizabeth provides.

¶5 Casey had insurance for liabilities arising from her midwifery through Centurion Insurance, but it expired in 2009. Centurion offered to extend tail coverage for BWH and its healthcare providers in 2009 and again in 2014. BWH declined both offers. Casey testified BWH would not purchase tail coverage for her because she was neither full-time nor retired, and that she did not ask BWH to purchase tail coverage.

### B. Schapker Sold BWH to Three Other Doctors in 2016 in a Sale Agreement.

¶6 On December 15, 2016, Schapker sold BWH for $3,000 to Dr. Giuseppe Ramunno, Dr. Thomas Le, and Dr. James Jew ("Buyers") under the Sale Agreement. John B. Even represented Schapker in the sale. Schapker approved the form of the Sale Agreement, which contains many provisions relevant to this appeal.

¶7 Page one of the Sale Agreement defines two "Parties." They are Dr. Alan Schapker as the "Seller" and Drs. Ramunno, Le, and Jew as the "Buyer." The Sale Agreement does not define BWH as a party to its own sale, instead identifying it as the "Company."

¶8 In Section 2 of the Sale Agreement, Schapker disclosed BWH's existing liabilities. Although he disclosed a property lease, a pending lawsuit, and other contracts, he disclosed nothing about any potential claim relating to Josie.

¶9 In Section 12 of the Sale Agreement, Schapker agreed to indemnify BWH and Buyers against any: (a) breach of warranty or representation in Section 6 of the Sale Agreement; (b) malpractice claims arising out of matters Schapker handled directly; and (c) claims made within one year of the Sale Agreement that Schapker committed fraud, or intentional or willful misconduct.

¶10        Section 15 of the Sale Agreement provides:

> 15. <u>Assignment</u>.  This Agreement and the rights of the Parties hereto may not be assigned, but this Agreement will inure to the benefit of and be binding upon the Parties hereto and their respective successors and legal representatives.

**C.   In 2017, the Naughtons Sued BWH, Casey, and Schapker for Josie's Injuries, Leading Casey and BWH to Tender the Defense to Schapker, Who Declined to Accept the Tender.**

¶11        On March 13, 2017, Shawn Naughton and Elizabeth Ketzler-Naughton filed a personal injury suit on their own behalf and as guardians ad litem for Josie, against BWH, CNM Casey and her husband, and Schapker and his wife.  In a July 18, 2017 letter, counsel for BWH and Casey tendered defense of their claims to Schapker.  On September 28, 2017, Schapker rejected the tender, explaining he did so because the Naughtons did not receive care under his "direction and control."  Schapker also claimed he lacked notice of the Naughtons' claims before selling BWH because they sued after the sale, and asserted he was not responsible for indemnifying BWH under the contract against the claims.

¶12        On October 24, 2018, the Naughtons filed a Notice of Intent to Attend Mediation with BWH and Casey.  On the day Schapker received the Notice of Intent, counsel for BWH and Casey e-mailed Schapker's counsel, offering that Schapker could "still take over the litigation as initially proposed."

¶13        In December 2018, the Naughtons, BWH, and Casey signed an agreement settling the 2017 suit.  The Naughtons filed a Rule 80(a) Settlement Memorandum, in which BWH agreed to settle all claims with the Naughtons for $8,500,000, and to enter into a judgment in favor of the Naughtons in that amount.  On February 1, 2019, the Naughtons filed a Motion for Determination of Good Faith Settlement under Rule 16.2 of the Arizona Rules of Civil Procedure.

¶14        Shortly thereafter, on February 11, 2019, the superior court dismissed the suit for lack of prosecution, while the Rule 16.2 motion was pending.  The court reinstated the case on its own motion after the Naughtons filed their Rule 16.2 motion but reinstated the dismissal on April 11, 2019.  The Naughtons never sought approval from the probate court of the settlement.

¶15 On May 15, 2019, the Naughtons filed a new personal injury suit against BWH, Casey, and Schapker, again seeking compensation for Josie's injuries. The Naughtons never sought to vouch Schapker into the 2019 tort action.

### D. Schapker Sought Declaratory Relief That He Had No Obligation to Indemnify BWH for the Naughton Claims, While the Naughtons Counterclaimed to the Contrary.

¶16 On February 20, 2019, Schapker filed an action seeking a declaration that he had no obligation to indemnify BWH for claims made against it concerning Josie's birth. Count One alleged Schapker was not liable to indemnify BWH for any claims relating to care for Josie or Elizabeth. Count Two alleged Mrs. Schapker and the marital community were not liable for any indemnity obligations under the Sale Agreement. Count Three alleged Schapker was not liable to indemnify BWH under any common law theory of liability relating to care for Josie or Elizabeth. Count Four alleged BWH could not assign any of its rights under the Sale Agreement.

¶17 On April 4, 2019, the Naughtons filed a Motion to Intervene as Third-Party Defendants on their own behalf and as guardians/conservators for Josie, but later withdrew this motion. On January 7, 2020, Schapker filed a Second Amended Complaint ("SAC"), which added the Naughtons as Defendants.

¶18 On February 10, 2020, the Naughtons filed a Counterclaim on their own behalf and as guardians ad litem of Josie. Count One alleged negligence and Count Two alleged a breach of duty and requested a declaratory judgment regarding Schapker's indemnity obligation. On April 22, 2020, BWH assigned all rights and claims it had against Schapker to the Naughtons.

¶19 On November 17, 2020, Schapker filed a Motion for Partial Summary Judgment, urging that as a matter of law, BWH's assignment was invalid. Schapker's position was that the phrase "[t]his Agreement and the rights of the parties hereto may not be assigned," could only mean that no rights under the Agreement could be assigned, even by BWH, which was not defined as one of the "Parties." The Naughtons opposed, arguing the nonassignment clause was ambiguous and susceptible of different interpretations. They also argued that questions of fact precluded summary judgment, including questions that would impact the interpretation of the nonassignment clause, such as the Buyers'

understanding of it, and whether Schapker drafted the agreement, making it subject to construction against him. Drs. Ramunno, Le, and Jew argued that they "did not understand the clause to include BWH, either at the time of the sale or any time thereafter." They would later argue in this court that the fact of Dr. Ramunno signing the assignment for BWH evidenced the doctors' subjective understanding that the assignment would be legally effective.

¶20        On May 19, 2021, the superior court adopted Schapker's interpretation of the nonassignment clause, and entered summary judgment for Schapker on Counts Two, Three, and Four of the SAC and Count Two of the Naughtons' Amended Counterclaim. The superior court found Mrs. Schapker and the marital community not liable for any indemnity obligations under the Sale Agreement. As to Count Three, the court found Schapker was not liable to indemnify BWH under any common law theory relating to care provided to the Naughtons, and as to Count Four, that the Sale Agreement was not assignable.

¶21        In May 2022, shortly after Josie turned 18, Elizabeth sought court appointment to be Josie's Guardian in the superior court. On August 3, 2022, Schapker filed another Motion for Summary Judgment on Count One of his SAC, arguing he was not liable under the Sale Agreement to indemnify BWH for any claim related to the Naughtons. On November 23, 2022, the superior court entered summary judgment for Schapker on Count One of the SAC regarding declaratory relief as to the Naughtons' alleged contractual indemnity rights and ordered Schapker to lodge a proposed form of judgment.

### E.        Schapker Obtained Attorneys' Fees and Costs Against the Naughtons Under A.R.S. § 12-341.01(A).

¶22        Schapker applied for his attorneys' fees and costs on December 22, 2022. Elizabeth argued Schapker should not receive fees under A.R.S. § 12-341.01(A) because the Naughtons were not parties to the Sale Agreement and their claims did not arise from it. On February 14, 2023, the superior court awarded Schapker $100,000 in fees and $3,514 in Westlaw charges.

¶23        Josie and Elizabeth timely appealed. We have jurisdiction under A.R.S. § 12-2101(A)(1) and Article 6, Section 9 of the Arizona Constitution.

## DISCUSSION

**¶24** Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). We review *de novo* a grant of summary judgment by the superior court. *Jackson v. Eagle KMC L.L.C.*, 245 Ariz. 544, 545 ¶ 7 (2019). We construe the facts in the light most favorable to the party against whom judgment was entered. *Ariz. Elec. Power Coop., Inc. v. DJL 2007 L.L.C.*, 246 Ariz. 534, 542 ¶ 29 (App. 2019).

**I.** **The Superior Court Erred by Granting Schapker Partial Summary Judgment on His Counts One and Four and the Naughtons' Count Two, Because There Are Fact Issues as to Whether BWH Was Entitled to Assign its Indemnity Rights to the Naughtons.**

**¶25** We review contract interpretation *de novo*. *Dunn v. FastMed Urgent Care P.C.*, 245 Ariz. 35, 38 ¶ 10 (App. 2018). When interpreting a contract, our purpose is to determine and give effect to the parties' intent. *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593 ¶ 9 (App. 2009). To determine their intent, we first look to "the plain meaning of the words as viewed in the context of the contract as a whole." *Earle Invs., L.L.C. v. S. Desert Med. Ctr. Partners*, 242 Ariz. 252, 255 ¶ 14 (App. 2017) (cleaned up). "[E]ach part of a contract must be read together, 'to bring harmony, if possible, between all parts of the writing.'" *ELM Ret. Ctr., L.P. v. Callaway*, 226 Ariz. 287, 291 ¶ 18 (App. 2010) (cleaned up). We will not construe one provision in a contract so as to render another meaningless. *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 175 Ariz. 273, 277 (App. 1993).

**¶26** Relevant here, rights and duties under a contract are freely assignable. *Highland Vill. Partners, L.L.C. v. Bradbury & Stamm Constr. Co., Inc.*, 219 Ariz. 147, 150 ¶ 11 (App. 2008) (citing 6A C.J.S. *Assignments* § 32 (2008)). A party like BWH can assign its contractual rights to a third party unless: (1) the assignment materially changes the obligor's duty or increases the obligor's burden or risk; (2) the assignment is prohibited by statute or violates public policy; or (3) the contract validly precludes the assignment. *Id*. (citing Restatement (Second) of Contracts § 317(2) (1981)). Schapker argues the third circumstance is present.

**¶27** But as we next explain, there are several reasons Section 15 of the contract is ambiguous on this point, requiring us to vacate the grant of partial summary judgment to Schapker on Counts One and Four of the SAC, and Count Two of the Naughtons' counterclaim. *See Fadely v.*

*Encompass Health Valley of Sun Rehab. Hosp.*, 253 Ariz. 515, 520 ¶ 19 (App. 2022) (explaining that whether a contract is ambiguous is a question of law); *Focus Point Props., L.L.C. v. Johnson*, 235 Ariz. 170, 177 ¶ 32 (App. 2014) (explaining that where contract is ambiguous, determining the parties' intent is a question of fact for the jury).

### A.   Section 15 Is Ambiguous, So Whether the Anti-Assignment Provision Applies to BWH Is a Question of Fact.

¶28        The superior court's partial summary judgment concerning assignability rests on its adoption of Schapker's theory that the plain language of the anti-assignment clause unequivocally prohibits the transfer of BWH's claims against him.

¶29        The dispute centers on Section 15's directive that "[t]his Agreement and the rights of the Parties" cannot be assigned.  Addressing each component of this term, the Naughtons argue: (1) BWH is "the Company" under the Sale Agreement, not one of the "Parties," and (2) Section 15 only prevents the entire agreement from being assigned, and BWH did not assign the entire agreement to the Naughtons.  Schapker counters: (1) BWH is a "Party" under Sales Agreement, and (2) Section 15 prevents any part of the Sale Agreement from being assigned, including the claim assigned here.  As we explain next, the Naughtons are right about the proper construction of the word "Parties," but that still leaves an ambiguity within Section 15's anti-assignment language to be resolved on remand.

### 1.   The Naughtons Are Correct That While Section 15 Bars the Parties From Assigning Their Rights Under the Agreement, BWH Is Not a Party.

¶30        The Naughtons are right that the word "Parties" in the Sale Agreement does not include BWH, and thus does not operate to bar the assignment of its claims against Schapker to them.  As such, when the Agreement prohibited the assignment of "the rights of the Parties hereto," that prohibition barred the assignment of the rights of Drs. Schapker, Ramunno, Le, and Jew – because they alone were "Parties" within that term's plain meaning.  *See Earle Invs.*, 242 Ariz. at 255 ¶ 14.

¶31        Accordingly, because BWH is not one of the "Parties" to the Sales Agreement, the word "Parties" in Section 15 does not prohibit the assignment at issue here.  That, however, leaves open the question of whether the prohibition of the assignment of "[t]his Agreement," which is untethered to "the Parties," bars the assignment.  We discuss that next.

### 2. Section 15 Is Ambiguous as to Whether it Permits BWH to Assign a Subset of its Rights under the Sale Agreement.

¶32        The Sale Agreement is ambiguous because there are two ways to read the prohibition in Section 15 of the assignment of "[t]his Agreement."  Schapker argues that term includes the Sale Agreement itself, and any rights under the Agreement.  That interpretation is consistent with the words of Section 15, and finds some support in case law.  *See Matter of Featherfall Restoration LLC*, 311 A.3d 437, 457–58 (Md. App. Ct. 2024) (where insurance policy said "Assignment of this policy will not be valid unless we [Travelers] give our written consent," the court "agree[d] with Travelers that the Policy's anti-assignment clause should not be read to allow assignment of any rights under the Policy so long as it does not amount to an assignment of the entire Policy.  As Travelers asserts, such a reading would allow insured parties to assign as many of their rights under the Policy as they desire so long as such assignment does not transfer the whole of the Policy, or would allow piecemeal assignment of the whole Policy, all without Travelers' consent.  This outcome would make the anti-assignment clause meaningless.").

¶33        Yet the Naughtons' contrary position – that BWH did not seek to assign the entire Sale Agreement to another party, and only a subset of its rights – is likewise consistent with the language of Section 15.   And like Schapker's position, the Naughtons' position is supported by case law.  *Farmers Ins. Exch. v. Udall*, 245 Ariz. 19, 21, 22 ¶¶ 10, 14 (App. 2018) (upholding four homeowners' assignments of their rights under an insurance policy containing an anti-assignment clause); *see Givaudan Fragrances Corp. v. Aetna Cas. & Sur. Co.*, 151 A.3d 576, 591 (N.J. 2017) (explaining that anti-assignment clauses in insurance contracts "apply only to assignments before loss, and do not prevent an assignment after loss.") (citation omitted).   An assignment can transfer some rights without transferring all of the rights within an agreement.  *Highland Vill. Parts.*, 219 Ariz. at 152 (holding the original owner of commercial property could expressly assign its rights under an implied warranty of workmanship and habitability); *Republic Ins. Co. v. Feidler*, 178 Ariz. 528, 534 (App. 1993) ("When an insured assigns his right to sue his insurer under a liability policy, the assignee takes only those rights that the defendant had.").

¶34        We thus find the contract ambiguous and remand for the jury to determine the parties' intent.  *Focus*, 235 Ariz. at 177 ¶ 32.

**B.** **The Doctrine of *Expressio Unius Est Exclusio Alterius* Also Suggests the Anti-Assignment Clause May Not Apply to BWH.**

¶35        The drafters' choice to mention BWH in other places in the Sale Agreement but not in Section 15's anti-assignment clause likewise makes plausible that BWH's rights to assign claims are not limited by Section 15.  That choice implicates the doctrine of *expressio unius est exclusio alterius* – that the expression of one thing in a class implies the exclusion of all other things not expressed. *Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, 529 ¶ 36 (2021).

¶36        Section 15 states the Agreement and the rights of the Parties may not be assigned but does not reference BWH.  By contrast, Section 12 addresses indemnification by Seller and provides, "Seller will indemnify Company [BWH] and Buyer and hold Company [BWH] and Buyer, and Buyer's heirs and representatives harmless from and against all liabilities, losses, damages, costs, and expenses . . . incurred by Company [BWH] or Buyer as a result."  Schapker and the other Parties to the Sale Agreement could have included BWH in Section 15 as was done in Section 12 but failed to do so.  This omission can be argued to suggest that Section 15 does not limit BWH's rights.

¶37        For all of these reasons, we find the term "[t]his Agreement" in Section 15 ambiguous as to whether it allows the assignment of any rights, and remand for the jury to determine the parties' intent. *Focus*, 235 Ariz. at 177 ¶ 32.

**II.** **The Superior Court Correctly Granted Schapker Summary Judgment on His Count Three Because the Settlement Lacked Required Approvals, and BWH and Casey Only Vouched Schapker into the 2017 Lawsuit.**

¶38        Schapker moved for summary judgment on Count III of his declaratory judgment action, arguing the Naughtons had not bound him to pay the $8.5 million settlement they reached with BWH in 2018 by vouching him into their 2017 suit. *See Foremost-McKesson Corp. v. Allied Chem. Co.*, 140 Ariz. 108, 111 (App. 1983) ("'Vouching in' is a common law procedural device that allows a defendant to conclusively bind a potential indemnitor to the judgment if certain requirements are met.").

¶39        The superior court agreed with Schapker that he had no common law indemnity obligation to the Naughtons despite their attempt to vouch him into the 2017 suit.  The superior court's reasons included: (1)

the lack of required probate court approval of the settlement of Josie's claims; and (2) the termination of the 2017 action by dismissal. The Naughtons argue on appeal: (1) they were not required to obtain probate court approval of the settlement, and in any event sought approval of it under Arizona Rule of Civil Procedure 16.2; and (2) that dismissing the 2017 suit was not fatal to their claim for common law indemnity. Even assuming the Naughtons vouched Schapker into the 2017 suit, the superior court did not err by granting Schapker summary judgment on Count Three.

### A. Schapker Has No Common Law Obligation to Indemnify the Naughtons for the Settlement, Because the Settlement Requires – But Presently Lacks – Probate Court Approval.

¶40 Our law is clear that to settle the claim of a minor exceeding $10,000, probate court approval is required. As Rule of Probate Procedure 53(b)(1) explains concerning the settlement of claims of minors, "[i]f the settlement exceeds $10,000, it must be approved by a superior court judge or judge *pro tem* in a probate proceeding under A.R.S. Title 14." *Id.* The Naughtons failed to seek this approval, and until they do it cannot be effective under Arizona law. As such, Schapker is right that he has no common law obligation to satisfy a presently invalid settlement.

¶41 The Naughtons' argument that moving for approval under Arizona Rule of Civil Procedure 16.2 fulfilled the purpose of the required probate court approval of Josie's settlement fails because those approvals are distinct and serve different purposes. Rule 16.2 does something fundamentally different from approval in the probate court – determining the good faith of a settlement as among a group of potential tortfeasors – making it insufficient here, even had it been obtained. *See* Ariz. R. Civ. P. 16.2. The probate code, by contrast, requires approval of settlements like Josie's to protect vulnerable persons against unwise or unfair settlements of significant claims – and the Naughtons have still not fulfilled this requirement. *See* A.R.S. §§ 14-5417, 14-5424 (authorizing duly appointed conservator to act as fiduciary in settling, with court approval, personal injury claims of protected persons). Finally, the Naughtons' argument also fails because they have not yet obtained approval under Rule 16.2. The court did not err by granting Schapker summary judgment on this claim.

### B. Schapker Has No Common Law Obligation to Satisfy a Claim Asserted in a Dismissed Case.

¶42 We also agree with the superior court and Schapker that "[a]t most, Dr. Schapker was 'vouched-in' to a judgment of dismissal." As noted,

11

vouching in seeks to "bind a potential indemnitor to the judgment." *See Foremost-McKesson*, 140 Ariz. at 111. But there is no judgment in the 2017 suit, nor will there be. Other jurisdictions' explanations of vouching in reinforce this point. *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 n.2 (5th Cir. 1991) ("Vouching in is a process whereby a civil defendant notifies a nonparty that a suit is pending against the defendant and that if liability is found, the defendant will look to the vouchee for indemnity and hold him to the findings in that suit."). Here, there were no operative "findings in [the 2017] suit" and never will be – it was dismissed. The Naughtons have thus not vouched Schapker into the defense of a matter that may end in a judgment in their favor.

¶43 Arguing we should treat their tender in the 2017 suit as tender in the 2019 suit, the Naughtons plausibly suggest Schapker would refuse a tender of BWH's defense in the 2019 suit if they made it. We cannot find the lack of tender in the 2019 suit harmless for three reasons. First, it is unclear why the Naughtons cannot simply tender the defense again, which is neither burdensome nor complex. Second, no Arizona case states that a party can vouch someone into a second lawsuit by tendering defense of claims in a comparable prior lawsuit, and we decline to mint such a rule today. Third, even when litigants invoke futility to excuse a demand the law requires, they must do more than the Naughtons did here. For example, before a stockholder can sue on behalf of a corporation, they must "exhaust[] all available means" within the corporation to obtain redress of their grievances or show that demand upon the corporation would be futile. *Rugee v. Hadley Prods.*, 73 Ariz. 362, 365-66 (1952). The Naughtons did not plead that tender to Schapker would be futile, nor did they ask the court to find as a fact that it would be. On that record, we cannot wave away their failure to demand that Schapker defend BWH in the 2019 suit, or their failure to plead and prove futility, as mere surplusage. For this reason too, the court did not err in finding the Naughtons failed to vouch Schapker into the defense of a suit in which he could face a judgment. We thus affirm the partial summary judgment for Schapker on Count Three.

### III. The Superior Court Did Not Err When It Granted Summary Judgment as to the Count One of the Naughtons' Counterclaim, to the Extent It Assertedly Involved Tail Coverage.

¶44 The superior court dismissed the Naughtons' "novel theory," based on agency principles, that Schapker negligently operated BWH by failing to provide it with tail coverage for claims against Casey arising out of Josie's birth. In their summary judgment briefing before the superior court, the Naughtons painted this claim as one sounding in negligence and

thus located within Count One of their Amended Counterclaim. In this court, Schapker and the Naughtons dispute, among other things, whether Casey's tail-coverage claims the Naughtons would assert are time-barred, and whether there is a duty to maintain tail coverage for Casey. We affirm the superior court's decision to dismiss any tail coverage claim in Count One.

¶45        As Schapker correctly argues, the Naughtons fail to demonstrate the existence of any legal duty to maintain tail coverage. They cite no statute creating such a duty. The Naughtons' attempt to cobble together a duty from a variety of disparate out-of-state sources is unavailing. Citing Section 8.15 of the Restatement (Third) of Agency that does not discuss insurance to demonstrate a supposed legal obligation for Schapker to purchase insurance when there is a Restatement of Insurance available to cite is unpersuasive on its face. Moreover, the provision the Naughtons cite applies where the risks of pecuniary loss are known only to the principal and not to the agent. Since the Naughtons offer evidence Casey previously had liability insurance for her professional acts and omissions, she was well aware of these risks and their insurability. *Marie Deonier & Assocs. v. Paul Revere Life Ins. Co.*, 9 P.3d 622 (Mont. 2000), which the Naughtons cite, is inapposite, as it concerns obligations between an insurance broker and an insurance company, and creates no duty of a former employer to maintain tail coverage indefinitely.

## IV.    The Superior Court Did Not Err in Finding That Elizabeth Was a Proper Party in Her Personal Capacity, Given Schapker's Claim Against Her For Declaratory Judgment.

¶46        While determining the propriety of Elizabeth's status as party is not strictly necessary to deciding this appeal because we vacate the fee award against Elizabeth, it is likely to recur upon remand, so we resolve it.

¶47        The Naughtons maintain Elizabeth is a proper party only as guardian of Josie, but not on her own behalf. The Naughtons assert their loss of consortium claim was dismissed in 2019, so Elizabeth never had standing individually in this suit. Schapker counters that dismissing Elizabeth as a party in the 2017 personal injury action did not exempt her from party status in this indemnity action.

¶48        Schapker and the superior court are correct. Schapker sued Elizabeth personally here, seeking a declaration as to his and her rights in relation to the $8.5 million settlement to which she is a party. While that is enough to justify her party status, Elizabeth also participated personally in

this suit in many ways. She responded to Schapker's complaint, with husband Shawn, "on their own behalf and as guardians ad litem of Josephine Marie Naughton, a minor, herein referred to as 'Naughtons.'" She also stated affirmative defenses, asserted counterclaims, and filed a complaint against Mrs. Schapker. We affirm on this point.

**V.      We Vacate the Award of Attorneys' Fees to Schapker.**

**¶49**      The superior court awarded Schapker $103,514.91 of attorneys' fees and Westlaw charges under A.R.S. § 12-341.01 and $2,657.37 of costs. Because that award rested on Schapker prevailing on a contract claim, a result we undo, we likewise vacate the award of attorneys' fees without prejudice to either party pursuing fees under § 12-341.01 when either prevails.

## CONCLUSION

**¶50**      For the reasons stated above, we vacate the entry of partial summary judgment for Schapker on Counts One and Four of his Second Amended Complaint and Count Two of the Naughtons' counterclaim. We likewise vacate the award of attorneys' fees and costs in favor of Schapker. We affirm the partial summary judgment rulings for Schapker on Counts Two and Three, and as to Elizabeth's party status. We deny Schapker's requests for attorneys' fees and costs in this court. We remand for further proceedings consistent with this decision.

